STATE of Tennessee, Plaintiff-Appellee,

v.

David Earl MILLER,
Defendant-Appellant.

Supreme Court of Tennessee,
at Knoxville.

May 29, 1984.

Rehearing Denied June 25, 1984.

Andru Volinsky, Public Defender, Manchester, N.H., Mark Evan Olive, U.N.C. School of Law, Chapel Hill, N.C., for defendant-appellant.

William M. Leech, Jr., Atty. Gen., Wayne E. Uhl, Asst. Atty. Gen., Nashville, for plaintiff-appellee.

## OPINION

HARBISON, Justice.

This is a direct appeal from a conviction of murder in the first degree and sentence of death, based upon the aggravating circumstances that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind.

### I

The victim, Lee Standifer, had diffused brain damage when born and was mildly retarded. She was twenty-three years old when she was murdered. She had been employed for about two years with a company that hired handicapped persons and was living at the Y.W.C.A. in downtown Knoxville, as a step toward her independence. She called her parents' home in Knoxville two or three times a day and visited them almost every weekend. She had her last conversation with her mother at about 5:30 p.m. on May 20, 1981.

In July 1979, defendant was hitch-hiking through Knoxville and was picked up by Benjamin Calvin Thomas, an ordained minister and school principal. On that occasion defendant cut the grass at Thomas' house in South Knoxville, was paid and resumed his hitch-hiking. Defendant returned to Knoxville a few weeks later and at the time of the murder had been living in the home of Thomas for more than a year. Thomas admitted that he had homosexual drives or inclinations and that early in his acquaintance with defendant they had a homosexual relationship. However, Thomas testified that defendant was not interested or responsive, that such a relationship gave him religious problems and that after a short period they were merely friends living together, and according to Thomas their relationship was almost that of father and son. A book which defendant had checked out of the Knoxville Public Library and other books belonging to him found at the Thomas home would support an inference that defendant had a morbid interest in sex.

In the early evening of May 20, 1981, defendant was at the Hideaway Lounge in downtown Knoxville. Lee Standifer was a few blocks away at the Y.W.C.A. and they conversed by telephone. They had been seen together at the Trailways Bus Station cafeteria prior to that date. After their telephone conversation defendant was seen walking to the Y.W.C.A., the victim awaiting there and the two of them walking away together. Apparently they first went to the Hideaway Lounge. They were next seen at the Knoxville Public Library, and then at the Trailways cafeteria, both in downtown Knoxville. There defendant engaged a taxi driver who drove defendant and Ms. Standifer to a point in South Knoxville near the Thomas residence.

Later that evening Thomas returned from Wednesday night church activities and drove into the basement garage of his home. He noticed that the area was wet, and after he got out of his car he saw defendant on the stairs to the basement. Defendant was not wearing a shirt and was in blue jeans. Thomas asked him why the basement floor was wet and defendant said he had "just hosed it out" because it needed to be cleaned. Thomas found the kitchen floor wet and two streams of blood leading from the living room to the dining room and kitchen area. He testified that when he asked for an explanation defendant said he had gotten into a fight and received a bloody nose. Thomas testified that he thought his carpet was ruined, and he told defendant that he could not "take this mess, you are just going to have to

leave." Early the next morning Thomas drove defendant on I–40 to the Mabry Hood Road exit, gave him twenty-five dollars and understood that defendant intended to hitch-hike to Houston, Texas.

Thomas did not return to his home until about 6:30 p.m. on the evening of May 21. As he was going down his driveway he saw a blue T-shirt hanging on a dogwood tree in his backyard. He got out of his car, walked over to examine the T-shirt and saw a nude female body lying face up with dried blood on the face, head and portions of the body. Pieces of rope were wrapped around it and he assumed the person to be dead. He went into his house and called the police.

That night and the next day the investigating police officers found blood spots on the walls of the living room near the fireplace, the kitchen, the inside of the garage door in the basement and other places. There was a poker in the living room and a hammer was found in the yard about fifty feet from the body near a jacket, shoes and panties identified as belonging to the victim and all blood-stained. The body was approximately 100 feet from the house, near a large tree in a sheltered thicket and in an unkept part of the yard with a deep accumulation of leaves. The victim's arms were extended over her head. A large hemp rope had been tied around her neck and extended up to bind her wrists, with sufficient extra length to use to drag the body.

A pathologist, Dr. Evans, testified that the victim had a wound on the right side of the forehead and a wound over the left eye, each of which was approximately three inches long and one-half inch wide. Each resulted in a skull fracture and a subarachnoid hematoma. Dr. Evans was of the opinion that those two wounds could have been caused by the poker kept in the living room of the Thomas residence. A stab wound passed completely through the neck and shattered the jawbone. According to Dr. Evans this indicated the use of an instrument such as a Bowie knife. He testified that substantial force had necessarily been used to pass the instrument through the jawbone. There were a total of five stab wounds in the chest area and one stab wound in the stomach. There was a stab wound into the floor of the mouth made with an instrument similar to that used to produce the neck stab wounds. There was a stab wound over the heart, eight to nine inches in depth that passed through the heart and aorta. Another stab wound went through the rib cage and completely through the fifth rib and a third stab wound went through the center of the chest. Again, Dr. Evans indicated that human strength may have been inadequate to plunge an instrument into a bony rib and that a hammer might have been used to drive a sharp instrument into those wounds.

There were two stab wounds in the back. One passed through the bony rib but the other one hit the left shoulder blade and did not penetrate except to the depth of the blade, approximately one inch. There were multiple bruises on the upper left and right thighs. Two were about the size of a hand that required a great deal of force and were inflicted before death in the opinion of the pathologist. He identified a number of the stab wounds as probably having been inflicted after the death of the victim. There were numerous scrapes and scratches and minor bruises to the legs, knees and upper body front and back, probably caused by dragging the body over rough surfaces. Dr. Evans testified that he found spermatozoa of fairly recent origin in the vagina of the victim.

Defendant was apprehended in Columbus, Ohio, on May 29, 1981, waived extradition and was returned to Knoxville by Detectives Winston and Ailor of the Knoxville Police Department. The officers interviewed defendant on tape in Columbus and again in Knoxville. *Miranda* rights were read and waived in writing on both occasions. The Columbus tape was not introduced into evidence because, according to Winston, it was of poor quality.

During the Knoxville interview that began at 6 p.m. on May 30, 1981, defendant

confirmed prior testimony that he was at the Hideaway Lounge, had a telephone conversation with Lee Standifer and went to the Y.W.C.A.: that they took a taxi at the Trailways Bus station and got out at Wise Hills and Stone Road. He did not remember going to the library but said he might have. He said he got out of the taxi and walked the remainder of the way to Thomas' house to clear his head, that he was drunk and a little sick. He said that when they got to the house Lee wanted to talk, and they went into the living room by the fireplace. She wanted to know what he was going to do and he told her he was going back to Houston. She became upset because she didn't want him to leave, grabbed his arm and he "turned around and hit her." He said he hit her with his fist and she fell down and when asked about additional blows he said he could not remember. At that point the interview continued as follows:

"WINSTON: Okay, tell me about when you removed her body from the room.

MILLER: I dragged her, pulled her out in the kitchen, went downstairs, got a rope and came back up, tied her up. And, she ...

WINSTON: Tied what?

MILLER: I don't know.

WINSTON: Did you tie her neck or her hands or what did you tie?

MILLER: I might have tied her neck and her hands, her hands or feet. I don't remember.

WINSTON: But you do remember hitting her don't you?

MILLER: Yes.

WINSTON: And you do remember the blood?

MILLER: Yeah, it just sprayed all over when I hit her.

WINSTON: It did? You knew you'd hurt her bad didn't you?

MILLER: Yeah.

WINSTON: You knew she was dead by the time you got her in the kitchen, didn't you? Had she quit moving them?

MILLER: She quit breathing.

WINSTON: She quit breathing? What did you do then?

MILLER: Drug her downstairs through the basement and out through the yard. And pulled her over into the woods."

Defendant further related that he went back inside and "started rinsing everything down." His version of what happened after Thomas came home and his leaving the next morning was remarkably consistent with the testimony of Thomas as to what occurred.

## II.

The defenses interposed at trial were that the evidence was insufficient to prove defendant's guilt beyond a reasonable doubt, that defendant was so intoxicated that he could not be convicted of premeditated · murder and that he was insane.

■ In our opinion, no evidence was introduced by either the State or the defendant sufficient to raise a reasonable doubt as to defendant's sanity, unless it could be said that atrocious, brutal acts inflicted upon Lee Standifer, in and of themselves, were sufficient to do so. However, a psychiatrist who examined defendant in June and November of 1981 was called by the State and expressed the opinion that defendant was not suffering from any mental disease or defect at the time of the murder, that he knew right from wrong and was able to conform his conduct to the requirements of the law. Thus, if a jury question existed as to whether defendant's sanity was proven beyond a reasonable doubt, that issue was submitted to the jury under a correct charge by the trial judge and they necessarily found that defendant was sane. The record contains substantial material evidence to support such a finding in addition to the testimony of the psychiatrist.

■ The issue of intoxication from drugs or alcohol or both and whether its degree was sufficient to negate premeditation was a contested issue in the case. Several of the State's witnesses had expressed opinions prior to trial with respect to the de-

fendant's intoxication on the night of May 20, 1981. These indicated a higher degree of intoxication than their direct testimony at trial.

Charlotte Jane Campbell, testifying for defendant, said she was at the Hideaway Lounge the afternoon of May 20, 1981, saw defendant buy one or more hits of L.S.D. and saw him put the cardboard containing the substance L.S.D. in his mouth and chew it. The witness bought some of the same drug and said it took effect on her in about thirty minutes and lasted about twelve hours; that it was a stronger drug than she normally had experienced. She testified that she bought three hits and chewed one and one-half hits, sharing the other half with a friend. She did not know whether defendant had more than one hit or whether or not he was also drinking intoxicating liquor. Three witnesses who saw defendant and the victim at the public library testified that defendant was intoxicated, noting that he was loud and staggered. Two of the witnesses smelled alcohol on his breath. All three witnesses were vague with respect to the degree of defendant's intoxication. The cashier at the Trailways cafeteria, who had known defendant for about eight months, testified that he spilled his coffee all the way to a booth, swayed and that his eyes were dilated and had a strange look.

On the other hand, there was considerable testimony from witnesses testifying for the State with respect to the degree of defendant's intoxication that support the jury's finding that it was not sufficient to render defendant incapable of forming a premeditated and deliberate design to kill. The jury was properly charged on that issue and their verdict was approved by the trial judge.

### III.

■ Defendant contends that the Knoxville taped interview and typed transcript should have been suppressed because it was tainted by the Ohio interview, which was prefaced by inaccurate *Miranda*[1]

warnings and trickery in procuring the signed waiver of rights. Defendant has seized upon the first words on tape that can be heard, by officer Winston, which, standing alone, would constitute an incomplete and inaccurate *Miranda* rights warning. However, Winston testified that he had read to defendant the typed form of complete *Miranda* rights that preceded the waiver on the single sheet that defendant signed. This recited that he had read the statement of rights, understood them, and was willing to make a statement, answer questions and did not want a lawyer. We find no violation of *Miranda* based upon the initial aspect of the interrogation in Ohio.

■ Defendant also contends that the interrogation techniques employed by officers Winston and Ailor at the jail in Ohio were psychologically coercive to the extent that the interrogation was improperly influenced and involuntary under the teachings of *Miranda* and that the taint of that interrogation rendered the Knoxville interrogation inadmissible. We do not agree.

Defendant at no time undertook to repudiate his confessions, either at the suppression hearing or at trial. A conclusion that they were involuntary or improper can only be based upon the tapes themselves or the testimony of the officers. There is no testimony by any witness that the officers unduly or improperly undertook to persuade the accused to give an incriminating statement.

On the contrary, it is uncontradicted that when the officers first undertook to interrogate the accused, he asked them what evidence they had against him. They properly advised him that they could not discuss the matter with him until he signed a waiver of his rights. He did so, and then began talking with them. He began his statement to them with an obvious falsehood—that he was engaged in a fight with another man at the home where the murder occurred, and that his own extensive nosebleeding accounted for the blood found

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct.  1602, 16 L.Ed.2d 694 (1966).

there. The officers then began to advise him of the evidence which they actually had. When faced with all of this, he finally admitted to having struck the decedent and having disposed of her body. He never admitted stabbing her or otherwise mutilating the body.

There is no indication in the record that he thought that he would escape the death penalty, or a life sentence or some other heavy penalty. At two points in the transcript of the first tape he stated that he knew that he could spend the rest of his life behind bars and that he might receive the death penalty. He was not misled by any statement of the officers that he might receive as little as ten years.

At more than thirty places in the transcript of the original tape the reporter has marked the record as being indiscernible. There is a great deal of background noise in the first tape. We do not believe that it was merely a ruse on the part of the officers not to use it at the trial. The second tape is clear, much more concise, and without any defect or indiscernible portions.

Under the holding of this Court in *State v. Kelly*, 603 S.W.2d 726 (Tenn.1980), we are of the opinion that the trial court correctly held that the incriminating statements given by the accused were voluntary, were given after proper warning, and were not the result of any improper influence or persuasion by the interrogating officers.

We have carefully considered all of the other issues presented on appeal and are satisfied that the record fully supports the conviction of the accused.

■ With respect to the sentencing hearing, however, we find reversible error. The State introduced evidence that defendant had been twice arrested on charges of rape. Both charges were dismissed. We are of the opinion that introduction of this evidence was improper and that a new sentencing hearing is required. *See State v. Teague*, 645 S.W.2d 392 (Tenn.1983); *see*

also *State v. Adkins*, 653 S.W.2d 708 (Tenn.1983).

In its brief the State points to an apparent inconsistency between the holding of this Court in *State v. Teague*, 645 S.W.2d 392 (Tenn.1983), holding arrest records generally inadmissible, and *Houston v. State*, 593 S.W.2d 267 (Tenn.1980), in which such records were permitted to be considered by the jury at the sentencing hearing.

■ Ordinarily mere arrests or indictments are not evidence of the commission of a prior crime. They are nothing more than charges or accusations made by the arresting or indicting authority upon such information as that authority had at the time.[2] They should, in our opinion, generally be held inadmissible, unless the accused makes them admissible for impeachment in some manner, such as his testifying that he had never been arrested or indicted. There may be other instances in which they could become relevant and admissible upon some specific issue. This apparently was the situation in the *Houston* case, *supra*, where defendant's testimony in a suppression hearing was held admissible to impeach contrary testimony given at the sentencing hearing. This is not the situation in the present case.

The conviction of defendant is affirmed. The death sentence is set aside and the cause is remanded to the trial court for a new sentencing hearing. Costs on appeal are taxed to the State.

COOPER, BROCK and DROWOTA, JJ., concur.

FONES, C.J., files a dissenting opinion.

FONES, Chief Justice, dissenting.

I respectfully dissent.

I agree with Sections I, II and the first grammatical paragraph of Section III of the majority opinion.

But, I agree with defendant's contention that the interrogation techniques employed by Officers Winston and Ailor that includ-

---

**2.** *See Montesi v. State,* 220 Tenn. 354, 417    S.W.2d 554 (1967).

ed misrepresentation and deception at the jail in Ohio, were psychologically coercive, that the confession was improperly influenced and involuntary and that the taint of that interrogation rendered the Knoxville interrogation and confession inadmissible.

The *Miranda* court, noting that coercion can be mental as well as physical, examined the modern tactics of in-custody interrogation as reflected by the police manuals and texts in use by law enforcement agencies.[1] Among the tactics that are relevant here because they were obviously used by the officers in the course of the Ohio interrogation are the following:

> [D]isplay an air of confidence in the suspect's guilt and from outward appearance to maintain only an interest in confirming certain details. The guilt of the subject is to be posited as a fact. The interrogator should direct his comments toward the reasons why the subject committed the act, .... The officers are instructed to minimize the moral seriousness of the offense, to cast blame on the victim or on society. These tactics are designed to put the subject in a psychological state where his story is but an elaboration of what the police purport to know already—that he is guilty. Explanations to the contrary are dismissed and discouraged.

86 S.Ct. at 1615.

After citing other tactics such as the Mutt and Jeff Act and the reverse line-up technique, the Court concludes:

> It is obvious that an interrogation environment is created for no purpose other than to subjugate the individual to the will of his examiner. This atmosphere carries its own badge of intimidation. To be sure, this is not physical intimidation, but it is equally destructive of human dignity. The current practice of incommunicado interrogation is at odds with one of our nation's most cherished principles—that the individual may not be compelled to incriminate himself. Unless ad-

equate protective devices are employed to dispell the compulsion inherent in custodial surroundings, no statement obtained from the defendant can truly be the product of his free choice.

*Id.* at 1619.

The United States Supreme Court said in *McNabb v. United States*, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 and repeated in *Miranda* that the voluntariness doctrine in state cases, encompasses all interrogation practices which are likely to exert such pressure upon an individual as to disable him from making a free and rational choice. 384 U.S. at 464, 465, 86 S.Ct. at 1623.

In the first part of the interrogation the two officers state facts and pose leading questions that make it clear to defendant that they are knowledgeable about the insignificant things he did, the places he had been and the people he saw on the day of the crime. They mention finding a half pint bottle of vodka that had had bourbon in it, said the preacher had told them defendant could not handle liquor and asked defendant if that was true. Defendant responded that he could handle liquor, whereupon Ailor observed that, "There ain't nobody that can handle acid, though, is there?", and defendant responded "No." He was then asked if he had a "bad trip" and he responded, "I reckon."

They told him Reverend Thomas said he found him in the basement that had just been washed out, wearing pants and no shirt, that they went up to the kitchen and there was blood on the table and defendant was asked if he remembered what he told Reverend Thomas. He responded that he told him that he got in a fight with some guy, that it started in the kitchen, but that he did not know the identity of the guy, just somebody he met on Gay Street. They told him that they knew he had been shooting pool at the Hideaway that afternoon and that according to Reverend Thomas the

---

1. The manuals are cited in *Miranda* footnotes eight and nine at 384 U.S. 448, 449, 86 S.Ct. 1614.

defendant got in a fight downtown and got his nose broken.

At this point he was asked if he remembered how he got from downtown to Reverend Thomas' house that night, if he remembered being at the Trailways bus station and the public library and his response to each question was that he did not remember. He did remember being at the Hideaway Lounge. They shifted to Lee Standifer, asked how long he had known her and was she pushing him to marry her and getting on his nerves. The officers asked if he had any "feelings for her" and he responded affirmatively. The officers then said they might as well tell him what they knew; that he had picked her up at the Y.W.C.A., took her to the Hideaway, and the library where he checked out the book *Insatiability*, that when he left the library they went to the bus station and again he was asked if he remembered going there and he said he did not. He was asked if he remembered getting in Jim Shook's cab and going out to Stone Road. He insisted that he could not remember leaving the Hideaway, "let alone being at the library and the Trailways." He was then asked if he had had sex with the victim before and if he had sex with her that night, both of which he denied. At about this time the officers produced a picture of Lee Standifer. Quoted excerpts from the transcript follow:

AILOR: David, you, look at you—you are on the verge of crying right now.

WINSTON: I believe you cared for that little girl.

AILOR: It's tearing you up inside.

WINSTON: I don't believe you're that kind of guy.

AILOR: You can help yourself by telling the truth.

WINSTON: If you was drinking and you made a mistake, son (indiscernable). If you was drunk—

(Whereupon there was a pause.)

MILLER: If I was drunk, if I was sober, I've still got the rest of my life to look at behind bars.

WINSTON: You're a young man. It makes a difference. She was drinking too, you know, I don't believe you meant to kill her. I believe you got carried away though after you—after you hit her.

(Whereupon there was a pause.)

WINSTON: Did she scratch your eyes or something?

MILLER: No.

AILOR: David, we have placed you drinking all afternoon, we have placed you picking her up, we have placed you taking her out—I think it was the Hideaway—where we have got a witness. I don't have all the notes right here with me. Place you in the library. Place her urinating on herself. It appeared to be you were drunk or high. We have got a police officer that you know, a cab driver that you know, both from going in the Trailways, could see you getting in a cab. The time frames all fit. We have got you with her at the house; and just a few minutes later we have got Calvin coming home in a house covered with blood, and you disappearing the next day. Son, you can only help yourself. No matter what happens, you're going to have to have peace of mind sooner or later.

WINSTON: She—her hair didn't look like that when you was dating her, did it?

AILOR: You are going to have to get it off your chest sooner or later.

. . . .

MILLER: One of you all got a match?

AILOR: I don't have any cigarettes; I've got a match though. Do they let you keep matches here?

MILLER: Yeah.

AILOR: Keep them.

MILLER: Thank you.

WINSTON: I don't believe you meant to do it, Dave. I don't believe you're that—that hard a person. I believe that liquor made you do it, and the pills.

MILLER: It wasn't liquor; it was the acid.

....

AILOR: Just tell us what happened David. What—what—

WINSTON: Son, we are trying to help you.

AILOR: What set it off that night?

(Whereupon there was a pause.)

AILOR: On acid—I have seen people on acid, and I have had good friends that were on it. And somebody could do something, and you change from must being in one frame of mind, and all at once you are just like that (snapped fingers) in another one, right? Is that basically what happened?

(Whereupon there was a pause.)

WINSTON: Did you have a bad trip when you all got to the house?

(Whereupon there was a pause.)

AILOR: David, there's two ways you can look at this. We've got—we've got (indiscernable) evidence on you. You can more or less throw yourself on the mercy of the Court, even though you are probably going to do some years. But if you keep it bottled up inside of you, ten years is going to seem like a lifetime. And you can get paroled in ten years. I have seen a lot of people on a murder charge get out in ten years, or less.

WINSTON: We are not saying you could get out in that—in that length of time, but if—

AILOR: We're not—

WINSTON: —if you were on acid, and the preacher come in, and he—he knows you was on acid. He said you were high.

MILLER: He knows I'm always getting high.

WINSTON: That's kind of like a drunk driver killing somebody, you know?

AILOR: If you get it off your chest, Dave, it's going to make—if you do serve time it's going to make that time easier. And if you cooperate with the police department and the District Attorney's Office who authorized us to come up here—we can't make you any deals, but if you try not to cover it up, Dave, and tell us what happened, it can't hurt you. Let's look at it that way. Look at it in that light. It can't hurt you. You can look at you and tell that it's eating you up inside, (indiscernable) at you.

In the instant case, the officers not only employed the subtle tactics recommended for success in obtaining confessions by the police manuals, but strayed far beyond the pale, in identifying themselves as authorized by the attorney general's office, suggesting to defendant that it could not hurt him to tell them what happened and to throw himself on the mercy of the Court; that defendant could be paroled in ten years, that lots of people on a murder charge got out in ten years and killing while on acid was kind of like a drunk driver killing somebody. All of those tactics preceded any incriminating responses by defendant.

We recently dealt with the standard to be applied in determining whether an alleged confession of a criminal defendant is sufficiently voluntary to be admitted into evidence in *State v. Kelly*, 603 S.W.2d 726 (Tenn.1980). Therein we cited *Bram v. United States*, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897) as the leading case and continued as follows:

"In that case the Supreme Court interpreted the Fifth Amendment to mean that in order for a confession to be admissible it must be 'free and voluntary; that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence.' 168 U.S. at 542–43, 18 S.Ct. at 187. Down through the years the *Bram* standard has been cited with approval and followed by the Supreme Court in *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964); *Brady v. United States*, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970); *Hutto v. Ross*, 429 U.S. 28, 98 S.Ct. 202, 50 L.Ed.2d 194 (1976)."

603 S.W.2d at 727.

The giving of *Miranda* warnings and obtaining a waiver of counsel does not authorize the subsequent use of physical or mental coercion that disables a suspect from making free and rational choices with regard to his continuing responses. It is my opinion that the in-custody interrogation at the jail in Columbus, Ohio, was permeated with psychological coercion and implied promises to the extent that defendant's inculpatory responses were improperly influenced and the entire interrogation would have been inadmissible if offered at trial. The State's professed excuse for not seeking its admission at trial was that the sound quality was poor. I have played the tape and read the court reporter's transcript of the tape which was accurate and the few indistinguishable words on the tape are clearly insignificant. The taped interrogation of defendant by the same two officers less than twelve hours later, that was introduced at trial, was free of improper inducements and most of the suspect tactics but, in my opinion, of substantially the same sound quality.

In *Kelly* we also discussed the decision of the United States Supreme Court in *Rogers v. Richmond*, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961). The following portions of our quotes from *Rogers* are, I believe, particularly relevant to the instant case:

> "Our decisions under that [Fourteenth] Amendment have made clear that convictions following the admission into evidence of confessions which are involuntary, i.e., the product of coercion, either physical or psychological, cannot stand. *This is so not because such confessions are unlikely to be true but because the methods used to extract them offend an underlying principle in the enforcement of our criminal law: that ours is an accusatorial and not an inquisitorial system—a system in which the State must establish guilt by evidence independently and freely secured and may not by coercion prove its charge against an accused out of his own mouth.* (Citations omitted.)
>
> ....

> "From a fair reading of these expressions (excerpts from the opinions of the Connecticut courts), we cannot but conclude that the question whether Rogers' confessions were admissible into evidence was answered by reference to a legal standard which took into account the circumstance of probable truth or falsity. And this is not a permissible standard under the Due Process Clause of the Fourteenth Amendment. The attention of the trial judge should have been focused, for purposes of the Federal Constitution, on the question *whether the behavior of the State's law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined—a question to be answered with complete disregard of whether or not petitioner in fact spoke the truth.*" (Emphasis added.) 81 S.Ct. at 739–41. 603 S.W.2d at 728.

I share what is obviously the belief of the majority of this Court and the trial judge, that the probability of the truth of defendant's confession is strong. However, it is my equally strong belief that the inexcusable behavior of the State's law enforcement officials falls squarely within the state and federal constitutional prohibitions against the use of methods that extract a confession by "implied promises, *however slight,* nor by the exertion of any improper influence." (Emphasis added.) 168 U.S. at 542–43, 18 S.Ct. at 187. The implied promises in the instant case were not slight, in my opinion.

There remains the question of whether the taint of the Ohio statement that was concluded after 7:00 a.m. in Columbus, had dissipated by the time the Knoxville interrogation began at 6:00 p.m. on the same day. If it had, the Knoxville statement was properly admitted. If not, its admission was clearly reversible error.

Defendant waived an extradition hearing in Ohio and Officers Winston and Ailor drove him to Knoxville. During the drive of seven to eight hours, defendant's hands

were handcuffed in front of him. According to Winston there was very little conversation about the offense during the drive, except that defendant mentioned something about his relationship with Reverend Thomas and a few other "casual minor things." They arrived in Knoxville about 5:30 p.m. and the interrogation that was admitted at trial began about 6:00 p.m.

In *State v. Painter*, 614 S.W.2d 86 (Tenn. Crim.App.1981), our Court of Criminal Appeals addressed the issue of whether an inadmissible first confession tainted defendant's second confession and rendered it inadmissible. That court cited the early case of *Deathridge v. State*, 33 Tenn. 75 (Tenn.1853). There the defendant was induced to confess at three separate places to which he was taken after his arrest for arson. The court concluded that defendant's first confession was "under the belief that he was to be used as a witness against his accomplices, and thereby escape any punishment for the crime. This, in itself, is a fatal objection to the confession." *Id.* at 79. With respect to the subsequent confessions the court said:

"We may observe, in the next place, that any confession thereafter made, under the same influences, is liable to the same objection; and it will be presumed that the same influences continued, until the contrary be made to appear. The *onus*, in this respect, rests upon the state."

*Id.* at 80.

*Deathridge* was followed by *Strady v. State*, 45 Tenn. 300 (Tenn.1868) where the admissibility of confessions subsequent to a coerced statement was treated as follows:

Now, the rule of law in such cases, is that, although the original confessions may have been obtained by improper means, yet, subsequent confessions of the same or of like facts, may be admitted, if the Court believe, from the length of time intervening, or from proper warning of the consequences of confessions, or from other circumstances, that the delusive hopes or fears, under the influence of which the original confessions were obtained, were entirely repelled. In the absence of such circumstances, the influence of the motives proved to have been offered, will be presumed to continue and to have produced the confessions, unless the contrary is shown by clear evidence; and the confessions will, therefore, be rejected: 1 Greenleaf's Ev., sec. 694.

*Id.* at 309–10.

The United States Supreme Court in addressing this issue in *United States v. Bayer*, 331 U.S. 532, 67 S.Ct. 1394, 91 L.Ed. 1654 (1947), made the following, often quoted observation:

"Of course, after an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed. He can never get the cat back in the bag. The secret is out for good. In such a sense, a later confession always may be looked upon as fruit of the first. But this Court has never gone so far as to hold that making a confession under circumstances which preclude its use, perpetually disables the confessor from making a usable one after those conditions have been removed."

331 U.S. at 541–42, 67 S.Ct. at 1398.

The federal cases apply substantially the same rule to be gleaned from *Deathridge* and *Strady*, with emphasis upon the devastating effect of defendant's having "let the cat out of the bag" and interrogators entering "the fray of the subsequent interrogation armed with the earlier admission of guilt." *See Gilpin v. United States*, 415 F.2d 638 (5th Cir.1969); *Harney v. United States*, 407 F.2d 586 (5th Cir.1969).

The Knoxville interrogation, conducted by the same two officers, was so closely connected with the Ohio interrogation that it may be described as a mere continuation. Nothing occurred during the automobile trip to make even a slight start in the process of entirely dispelling the mental coercion and implied promises by which Winston and Ailor got the "cat out of the bag" in Ohio.

In *Gilpin* the interval between the first and second interrogation of four days was held insufficient to dispell the coercive effect of the first interrogation. I would find that the illegal influences that tainted the Ohio interrogation had not been dispelled when the Knoxville interrogation was conducted and that the defendant's incriminating responses were therefore improperly influenced and inadmissible. In spite of the fact that, excluding the Knoxville interrogation, substantial evidence of defendant's guilt was presented at trial, I cannot say that the erroneous admission of that incriminating statement was harmless beyond a reasonable doubt. It was therefore, in my opinion, reversible error for which defendant should be granted a new trial.