STATE of Tennessee, Appellee,

v.

Hubert Lloyd SHEFFIELD, Appellant.

Supreme Court of Tennessee,
at Jackson.

Aug. 27, 1984.

William M. Leech, Jr., Atty. Gen., Gordon W. Smith, Asst. Atty. Gen., Nashville, for appellee.

A.C. Wharton, Jr., Shelby County Public Defender, Edward G. Thompson, Robert W. Jones, W. Mark Ward, Asst. Public Defenders, Memphis, for appellant.

## OPINION

FONES, Justice.

This is a direct appeal of a death penalty case. Defendant was convicted of first degree murder in the perpetration of rape and sentenced to death upon the jury's finding of three aggravating circumstances, to wit: subsections 2, 5 and 7 of T.C.A. § 39-2-203(i), and no mitigating circumstances.

### I.

Ruby Marlar and her husband Hill Marlar lived on Addison Street near the National Cemetery in Memphis. Their house was just a half block from Whittier Street, where defendant and his friend William Pratere, one of the principal witnesses, lived.

On New Year's Eve, December 31, 1979, Mr. and Mrs. Marlar began celebrating about 5:00 p.m. They visited Nita's Lounge, the Viaduct Lounge and Knight's Cafe, where Mrs. Marlar worked part time but she was not working on New Year's Eve. About 2:00 a.m. Mr. Marlar went home, by mutual agreement, having made arrangements for someone to drive Mrs. Marlar home. Mr. Marlar had been asleep about two hours when he heard his wife knocking at the door, but by the time he opened it, she was gone. He was not disturbed because her brother lived about one and a half blocks away and on previous occasions she had walked to her brother's house and spent the night. If that was her destination that morning, she did not get there because she had an encounter with defendant, "Butch" Sheffield, or his friend Gary Haning, or both of them. Her body was discovered beside a dirt road near Lakeland Lake in Shelby County, on Janu-

ary 5, 1980, with a seven inch incision to her neck that almost severed her head from her body and, of course, caused her death. Tests revealed seminal fluid and sperm in her vagina and anus and saliva on her breast and a blood alcohol level of 0.51%.

Gary Haning testified that he had been given a life sentence for his participation in the murder of Mrs. Marlar and that the State had made no deal with him other than that he would not be incarcerated in the same facility as defendant and that the attorney general would write the parole board to the effect that he had testified under "difficult circumstances."

Gary Haning's version of the events that culminated in the murder of Ruby Marlar was that he had gone to sleep at Mike Pratere's house, woke up cold, went to the heater, fell and burned his leg and back; that Mike and defendant came in about 3:00 a.m., defendant left for a while and Mike bandaged his burns. Defendant returned within thirty or forty minutes and told him that he had a drunk lady in the car and wanted his help to "con" her out of her money or otherwise take it from her, to which he agreed. He testified that he got in the back seat of defendant's car and defendant drove the three of them out Summer Avenue toward Ellendale. He denied that he had known Ruby Marlar before and said that the lady was mad because her husband would not let her in the house and that defendant had told him he found her walking down the street; that defendant was ostensibly complying with her request to drive her to her mother's home in Ellendale; that when they passed the turn-off to her mother's house she was upset but defendant told her that he wanted her to go to the door of a house near Lakeland and get a girl to come out, because her father would not allow her to go out with defendant.

Haning testified that the lady "was drunker than both of us," and defendant drove down near a dock on Ellendale Lake, stopped where they could just see the top of a building that looked like a house and tried to get the lady to leave the car and get his girlfriend to come out. She refused to do that but she accepted Haning's invitation to join him in the back seat and they "began to have sex." Defendant was in the front seat, rolled a joint and rifled the victim's purse. When Haning heard the purse hit the floorboard, he stopped having sex and got out of the car. Defendant then got in the rear seat with the victim and after a few minutes Haning heard and saw defendant beating the victim with his fist. He said defendant was beating her because she objected to his "going at her from behind." Haning weighed one hundred and ten pounds and defendant weighed two hundred and ten or more, but Haning said he remonstrated with defendant and told him he should not treat the victim that way. According to Haning, defendant got out of the car and told the victim to get out, whereupon he grabbed her by the hair and cut her throat. Haning testified that he could not believe what he had seen. That he was sick, surprised and shocked. He said that defendant drug the victim a short distance down the road, threw out a number of Miller beer cans from the car and they drove away. Haning testified that as they drove away he heard the victim making noises like she was drowning.

Haning admitted that he had told the police on various occasions, and testified to, different versions of the events of that evening but insisted that his stories had been consistent except that he had left himself out as a participant in various episodes in an attempt to "beat" his case. He also admitted that he had thrown his hunting knife away in a field near Ripley, Tennessee, shortly after the date of the murder.

Mike Pratere had only known defendant a few months prior to December 31, 1979; but he and defendant had worked together, contracting and performing painting and flooring jobs. They resided in houses that were only a half block apart on Whittier Street. Pratere testified that he had met Haning for the first time that New Year's Eve when he and defendant stopped by the Haning residence about 10:00 p.m. He de-

scribed in great detail a fight between Haning and his pregnant wife, highlighted by her breaking the T.V., throwing a machete and firing a gun as the three men left the Haning residence. According to Pratere, Mrs. Haning was upset about the men drinking beer and because her husband and defendant were talking about going to Mississippi and stealing some boat motors.

Pratere said that he, defendant and Haning went to Pratere's house and left Haning there while he and defendant went to the hospital to be with his diabetic wife at midnight. After the hospital visit he and defendant stopped at the Krystal near Sears to eat and eventually went to the home of a girlfriend of defendant's, Diane Arnold. They left Diane Arnold's house about 4:00 a.m. and drove the short distance to Pratere's house on a flat tire. They discovered that Haning had awakened from his drunken sleep and fallen over a gas heater and burned his right side and back. Pratere further tracked Haning's testimony to the effect that he doctored Haning's burns while defendant was gone to get his own car. Pratere testified that Haning began playing around with a knife and started throwing it in the house. That provoked an argument between them; and when defendant returned, he took Haning's side of the argument; and after whispering something to Haning, the two of them left and Pratere went to bed.

Pratere testified that he dozed off and was awakened by a dog barking and screams; that he looked out into the street, at an angle in the direction of Ruby Marlar's house [1] and saw defendant holding a woman and Haning with a knife to her throat and "she was like a rag doll when they threw her in the car." He elaborated that "Well, to me, you know, it looked like her throat got cut. To me. That's the way it looked at the time. But she got as limp as a rag and they threw her in the car." Pratere said they drove off toward the National Cemetery and came back about

two hours later, around daybreak, and woke him up. Pratere testified that Haning and defendant's clothes were bloody and when he asked what happened defendant said he ran over somebody.

On cross examination Pratere acknowledged that in relating an earlier account of those events he had said that he went out to his front yard clad only in his underclothing and started to go across the street where Haning, defendant and the woman were but fell in a ditch; that his next door neighbor, Sidney Gattis, a part time preacher, was standing in his yard and witnessed the throat cutting, the throwing of the limp woman in the car and the departure of the three of them.

Sidney Gattis was called as a witness and said that he was at home that evening with his wife and two children and neither heard anything unusual nor saw anything unusual during the night or early morning hours of that New Year's Eve and Day.

Defendant took the stand and gave a different version of his activities and those of Haning and Pratere during the critical morning hours of 4:00 a.m. to 6:00 a.m. He testified that after he transferred the license tags from Pratere's car with a flat tire, to his car, he got more beer, drove Haning around looking for a "joint" for Haning and finally returned to Pratere's house. Pratere was passed out drunk, defendant had had enough, but Haning wanted to continue looking for a "joint," or to go to his house where he had hundreds of pills. Haning asked to use defendant's car, defendant gave his consent, and when Haning left defendant went to sleep on the couch in Pratere's living room. Defendant was awakened about daybreak, approximately 6:00 a.m., by Haning knocking to get in. That testimony, of course, sent Haning out alone in defendant's car for the critical hours when the murder was committed.

At approximately 7:30 a.m. on January 1, 1980, a fire was observed just inside the

---

**1.** Pratere testified that he did not know Ruby Marlar nor where she lived on January 1, 1980, but at the time he testified he knew where she

lived and placed the scene which he described as near the corner of Whittier and Addison and between his house and Ruby Marlar's.

wall at the National Cemetery. It was extinguished and found to be a woman's purse containing a still legible social security card and other items indicating that it belonged to Ruby Marlar. The burned purse and its contents were turned over to the police and that initiated the investigation that resulted in the indictment and trial of Haning and defendant.

Defendant testified that when Haning returned to Pratere's house about 6:00 A.M. he wanted more beer, got in his car with Haning as a passenger and went over to Rakestraws Store by the National Cemetery. They would not sell him any beer and when he came back to the car he saw a woman's purse for the first time. When he asked Haning about it, the response was that Haning had "ripped off a drunk bitch." Defendant testified that he reasoned that with his record he could not afford to be charged with purse snatching so he threw the purse over the wall into the National Cemetery and he and Haning went over the wall. Defendant poured some Coleman lighter fluid over the purse and its contents and Haning "set the match on it."

Mr. Marlar testified that his wife weighed about 145 pounds and "pretty well knew how to take care of herself."

Screening tests on defendant's knife by a forensic serologist were positive for blood. A screening test on defendant's jeans revealed the possibility of blood on the right knee. The jeans were wet and smelled of detergent when found.

## II.

■ Defendant questions the sufficiency of the evidence to justify a rational trier of fact in finding beyond a reasonable doubt that defendant was guilty of first degree murder.

Questions of credibility of the witnesses are for the jury. The jury has obviously accepted the testimony of Haning that he was an eye witness to the cutting of Ruby Marlar's throat by defendant. They have rejected the testimony of Pratere and defendant and the record reveals sufficient contradictions and circumstantial evidence to justify a rational trier of fact in so doing. Pratere's insistence that his next door neighbor Gattis witnessed, along with Pratere, what looked like a throat cutting by Haning was flatly contradicted by Gattis. Gattis clearly qualifies as a disinterested witness while Pratere does not because of his friendship with defendant. But, Pratere's version contradicts the most critical feature of defendant's testimony by having defendant and Haning leave Pratere's house together around 4:00 a.m. and return together around 6:00 a.m.

The defendant's testimony that Haning, weighing 110 pounds, embarked upon and carried out alone the abduction from the National Cemetery area to Lakeland, the vaginal rape, the anal rape and the throat cutting of Mrs. Marlar, a 145 pound woman who could "take care of herself," could be rejected as most unlikely if not incredible, by a rational trier of fact. We find that the evidence of defendant's guilt satisfied the standard prescribed in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), and T.R.A.P. 13(e).

Defendant's issue asserting the unconstitutionality of the Tennessee death penalty statute has no merit. We have fully dealt with similar contentions in prior reported cases. *See e.g. State v. Austin*, 618 S.W.2d 738 (Tenn.1981).

Defendant insists that the trial court erred in refusing to dismiss the indictment because Shelby County has discriminated against women in the selection of grand jury forepersons. The reasons we gave in *State v. Coe*, 655 S.W.2d 903, 909–910 (Tenn.1983), for finding that Coe had no standing to raise a sex discrimination issue with respect to the composition of the grand jury are applicable in equal force to defendant's contention in this case.

■ Defendant contends that prospective jurors Presley, Shipp, Miles, Mitchell, McNeal and Moore were excused for cause erroneously, because their views of capital punishment did not disqualify them under the test prescribed in *Witherspoon v. Illi-*

*nois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). We have read the examination of these jurors and while at times each gave confusing and sometimes inconsistent responses, their final unequivocal positions rendered each of them subject to dismissal under the *Witherspoon* criteria.

Defendant insists that the trial court erred in overruling his objection to the use of a prior conviction for manslaughter for impeachment purposes. The defendant moved pre-trial for an order prohibiting the use of that prior conviction on the ground that the prejudicial effect outweighed the probative value under *State v. Morgan,* 541 S.W.2d 385 (Tenn.1976). In the order overruling defendant's motion and allowing the State to cross examine defendant with respect to the voluntary manslaughter conviction, the trial judge gave as his reasons for concluding that the probative value of that evidence outweighed its prejudicial effect that (1) the elements of rape and murder in the first degree are substantially different than the elements of voluntary manslaughter; (2) the defense made no showing that the offense committed by defendant involved passion or provocation; and (3) persons who disregard the law and commit crimes against other persons, such as homicide, would have the same disregard of the law against perjury.

■ Under Rule 609(a) Federal Rules of Evidence, adopted in *Morgan,* two different classes of convictions are admissible for the limited purpose of impeachment. First are those crimes punishable by death or imprisonment in excess of one year, if the Court determines that the probative value of admitting the prior conviction outweighs its prejudicial effect to the defendant; and second, those crimes involving dishonesty or false statements, regardless of punishment.

In November 1974, defendant entered a plea of guilty to voluntary manslaughter in a case wherein he had been indicted for murder in the first degree and was sentenced to serve not less than two nor more than ten years.

■ No one has contended that voluntary manslaughter involved dishonesty or false statement. It was squarely within the first class of convictions embraced by the rule, did not invoke the ten year time limit and its admissibility depended entirely upon whether its probative value outweighed its prejudicial effect. The argument that voluntary manslaughter does not relate to a witnesses' veracity or honesty has no relevancy whatsoever on the admissibility of convictions falling into the first category described in Rule 609(a).

In deciding whether or not a trial judge has abused his discretion in determining whether a prior conviction's probative value outweighs its prejudicial effect, the federal appellate courts have generally used guidelines that had their origin in two District of Columbia circuit cases that pre-dated the adoption of Rule 609, *Luck v. United States,* 348 F.2d 763 (D.C.Cir.1965) and *Gordon v. United States,* 383 F.2d 936 (D.C.Cir.1967), *cert. denied,* 390 U.S. 1029, 88 S.Ct. 1421, 20 L.Ed.2d 287 (1968). The guidelines that have thus evolved are (1) the nature or impeachment value of the crime; (2) the time of the conviction and the witnesses' subsequent history; (3) the similarity between the past crime and the charged crime; (4) the importance of defendant's testimony; and (5) the centrality of the credibility issue. While examination of those factors may be useful to trial judges in some cases, we decline to adopt them. We think it inappropriate to introduce the rigidity that inevitably accompanies the mandated use of express guidelines for the exercise of judicial discretion involving the weighing and balancing of elusive concepts.

■ The first guideline seems particularly inappropriate to us because, as applied by the federal courts, the crime involved is equated with its relevancy to dishonesty or false statement. When we adopted Rule 609, we regarded the two classes of convictions embraced in 609(a) as identifying a more clearly defined category of crimes than that embraced in the prevailing rule,

to-wit: "offenses involving moral turpitude." We had no intention of limiting the use of prior convictions to those crimes involving dishonesty or false statement and imposing such limitations on the determination of the probative value versus the prejudicial effect of crimes punishable by sentences of more than one year so that only those crimes that involve a very close relationship to dishonesty or false statement would be embraced therein. In short, we interpret the rule as including two distinct categories: those crimes directly involving dishonesty and false statement and those crimes having nothing to do with dishonesty or false statement but involving disregard of legal and moral rules of civilized society and serious enough to be punishable by imprisonment in excess of one year. The admissibility of this latter category is subject to the trial judge's determination of the probative value versus the prejudicial effect and does not call for consideration of factors which virtually eliminate crimes not involving dishonesty or false statement. This Court does not adhere to the simplistic view of some of our sister states cited by defendant that only crimes involving larceny, cheating, deceit or fraud are relevant character traits bearing upon the credibility of a witness. *See e.g. People v. Newton,* 107 Cal.App.3d 568, 166 Cal.Rptr. 60 (1980).

■ In this case the predominant consideration in weighing the admissibility of the manslaughter conviction was the similarity between that prior conviction and the crime for which defendant was on trial. We disagree with the trial judge in finding that the elements of the two crimes are substantially different. It is true as defendant asserts that the similarity raises the specter before the jury that "if he did it before, he probably did it again."

The fourth factor that the federal courts use, shorthanded to "the importance of defendant's testimony" poses the question that if the trial judge determines the prior conviction should be admitted and as a result the defendant decided that he would not take the stand, has the search for truth been jeopardized because the jury did not hear defendant's version of the case.

■ Defendant elected to testify and give his version of the case in spite of his knowledge that the State would be allowed to use his prior conviction of manslaughter for impeachment. It can be said of almost every murder case that it would be important to have the defendant's version of the case and we are somewhat at a loss to know what factors of a murder case render the defendant's testimony more important than in others and how to equate that situation with the exercise of the Fifth Amendment. In short, we reject the use of that factor as having any significance whatsoever in balancing probative value with prejudicial effect.

Defendant's sentence on his guilty plea to voluntary manslaughter was not less than two years nor more than ten years. The record is not clear on when he was released but, assuming it was two years after the conviction, to-wit: November 1976, this offense was committed only three years later. During that period defendant was arrested many times. The "time of conviction and subsequent history" factor used by the federal courts was heavily weighted in favor of admission of the prior conviction.

Some federal courts have allowed the use of voluntary manslaughter convictions for impeachment purposes under Rule 609(a)(1), Federal Rules of Evidence. *See e.g. United States v. Jackson,* 627 F.2d 1198 (D.C.Cir.1980); *United States v. Oakes,* 565 F.2d 170 (1st Cir.1977); *United States v. Russo,* 540 F.2d 1152 (1st Cir. 1976).

■ In our opinion, the balancing of the probative value against the prejudicial effect from the pages of the transcript produces a very close result but we are unable to say that the trial judge abused his discretion in allowing the State to use the voluntary manslaughter conviction for impeachment purposes. *See State v. Stafford,* 670 S.W.2d 243, 245 (Tenn.Crim.App. 1984). The judge gave the appropriate in-

struction to the jury that this evidence could be considered only in determining the weight of defendant's testimony. It is further our opinion that the defendant's version of the crucial events that took place between 4:00 a.m. and 6:00 a.m. on January 1, 1980, was so incredible when viewed against the known circumstances established by clear and convincing evidence that his testimony had no probative value, without regard to any effect his prior conviction may have had upon his credibility.

■ Defendant asserts that the trial judge erred in allowing the State to question defendant about his presence in a motel with a fifteen year old girl the night before his arrest and allowing the State to ask witness Tackett if defendant did not have a temper when he was drinking.

Neither question was relevant to any material issue in the case and both questions were obvious attempts to improperly prejudice the jury against defendant. However, the impact of these errors in the context of the evidence in this case was, in our opinion, insignificant and therefore harmless error.

■ Defendant asserts that the trial judge erred in instructing defense counsel not to refer to a "deal" in reference to the testimony of Haning and in limiting cross examination of Haning about his agreement with the State in exchange for his testimony. On direct examination it was revealed by the State that the district attorney had agreed to notify the corrections department that Haning should be kept in a different penal institution from that of defendant, recommend that Haning be kept in a regional prison in Shelby County and advise the parole board that Haning had testified under difficult conditions. Our reading of the transcript reflects that defense counsel cross-examined Haning thoroughly about the agreement with the State and referred to it as a "deal" numerous times without any limitation by the trial judge. When the questions and answers invoked consideration of what the parole board might do, the trial judge told defense counsel to move on to something else to

which counsel responded "All right." Later, Haning was asked "Isn't it a fact that if you go to the regional prison that you'll be out there [sic] quicker than a fox out of the hen house?" Whereupon the trial judge properly said "That is not a proper question, counselor." There is no merit to this issue.

Defendant says that the trial judge erred in *"refusing* to sustain the defendant's objection to the prosecutor's deliberate reference to parole time for one convicted for murder and in *refusing* to give a curative instruction." [Emphasis added.]

On redirect after Haning's cross examination, during which defense counsel asked whether the witness expected benefits from the State's communication to the parole board, the prosecutor asked whether Haning's attorney had explained to him what the parole time was for life imprisonment. Haning responded "Thirty—," whereupon defense counsel interrupted with an objection. The State's question was improper. *See e.g. Smith v. State,* 527 S.W.2d 737 (Tenn.1975). The transcript filed in this Court reflects that the trial judge sustained defendant's objection and nowhere do we find a request by defense counsel for a curative instruction, contrary to defendant's assertion that the trial court *refused* to sustain the objection and *refused* to give a curative instruction. There is no merit to this issue.

■ Defendant insists that the trial judge erred in charging the jury that one who "kills" during the perpetration of a felony is guilty of murder in the first degree, when the statute uses the word "murder" in setting out the elements of felony murder. Defendant contends that the felony murder statute requires that the State prove the elements of malice necessary to constitute murder in the first degree and then prove that it was done in the commission of a felony—that the holdings of Tennessee courts that malice and intent are supplied by the felony creates a legal presumption that runs afoul of the holdings in *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct.

1881, 44 L.Ed.2d 508 (1975); *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); and *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450 (1979). In *Smith v. State*, 209 Tenn. 499, 354 S.W.2d 450 (1961), this Court held that the statute makes killing of a human being murder in the first degree when it is committed in the perpetration of a listed felony. The authorities relied upon by defendant dealt with instructions that shifted the burden of proof to defendant, which is not the effect of our felony murder statute as interpreted in *Smith v. State, supra.*

■ Defendant relies upon *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), to assert the proposition that the death penalty cannot be imposed absent a specific finding that the defendant took or intended to take the life of the deceased. In support of that assertion defendant argues facts that implicate Haning as the sole perpetrator of the murder, or at least leave defendant in the role of an aider and abettor to the murder. Enmund waited in a car while two others committed the felony murder, in the case relied upon by defendant, wherein the Supreme Court held the death penalty could not be imposed upon one who aids and abets in a felony but who does not kill, attempt to kill or intend that lethal force be employed.

*Enmund* does not require a jury instruction or a specific verdict to that effect, as contended by defendant, and there is no merit to this issue.

### III.

Defendant raises several issues with respect to the conduct of the sentencing hearing.

Defendant contends that the trial judge erred in allowing the State to introduce Memphis police arrest reports and relate unnecessary hearsay therein, during the cross examination of defendant's expert Dr. Wilks, a sociologist. Wilks testified that defendant was abused as a child and brought up in an environment characterized by a tremendous amount of violence, abusive language and drinking and that defendant had no positive role model. The relevant opinions expressed by Dr. Wilks were that defendant's electrocution would not be a deterrence to other people with similar background, that defendant's problems were the result of emotional deprivation and that it was not too late in life for defendant to find in someone interested in his development, a role model, and implicitly, be a stable member of society. On cross examination it was established that Dr. Wilks knew about defendant's prior conviction of voluntary manslaughter but did not know of any other alleged criminal activity. Under persistent questioning, Dr. Wilks admitted that it was important that he know about defendant's past criminal activity "to aid in diagnosis ... of why this individual is like he is today." Along with that admission, Dr. Wilks affirmatively stated that "my decision today is not based upon his prior criminal activities," a statement borne out by his direct testimony.

Defendant first objected on the ground that it was improper to introduce misdemeanor arrests and later objected strenuously to the scope of the details in the report and the use thereof by the prosecutor in framing questions, an example of which follows:

Q  Were you aware, doctor, that on October 3, 1977, Mr. Hubert Lloyd Sheffield was arrested in Memphis, Tennessee, for drunk and disorderly conduct involving the beating of a young female with a large stick in front of a yard at 1260 Agers Place (phonetic spelling) in Memphis, Shelby County, Tennessee. Were you aware of that type of criminal conduct, doctor?

A  No, I was not.

Q  And he was drunk and disorderly at the time he was beating this young female white. You were not aware of that?

A  No, I was not.

Q  Would that be important in assessing Mr. Sheffield's character here today?

A It would be important but it would only add credence to my report in terms of looking at the environment as being a dominant factor in shaping one's behavior.

Q The fact that a witness saw him beating a woman?

Defense counsel objected strenuously to that tactic by the State, the jury was excused and lengthy argument was heard by the trial judge resulting in his overruling defendant's objection and upon the jury's return the prosecutor was allowed to proceed as follows:

Q. All right. Now, I have—I've been reading to you from—there are six Memphis Police Department arrest tickets, okay? And all I'm going to do, in the interest of time, is just go over these six statements and briefly state what the type of conduct was involved regarding the Defendant, because that's what we're talking about here is the Defendant and his conduct in the past okay? And then after I briefly state this, then you can tell the ladies and gentlemen, with this knowledge, reassess or decide whether or not this would aid you further or not aid you further in your basis—in forming your opinion, okay?

A. Okay.

Q. On January the 24th—let me see, I have them—January the 24th of 1976, the defendant was arrested for carrying a pistol and this was in Memphis. He was at a cafe and he was passed out at the time. The officers came up and he was passed out and he had a revolver in his pocket. So he was carrying a pistol at the time and was arrested for that. That's basically the facts of that arrest, okay? His conduct, the fact that he had a pistol on him.

On June the 14th, 1976, the Defendant was arrested for DWI and drunk. This involved him speeding and the officers catching up, pulling him over. At the time they pulled him over, though, he became abusive to the officers and began cursing them and he was placed under arrest when they noticed the alcohol and so forth on his breath and arrested him for DWI and drunk. Se we—from those facts that I've briefly stated he had been drinking and became abusive and cursed at the officers on being stopped—by police officers here in Memphis, okay?

The next one is June the 22nd, 1976, when the Defendant was arrested by police officers in Memphis for disturbing the peace. This involved a fight call here in Memphis where three men were involved in a fight with one of them being Hubert Lloyd Sheffield. When the police pulled up and tried to stop the fight, the Defendant said—Hubert Sheffield was making the quote that they were only playing. And then he began to be abusive and cursing the police officers which resulted in his arrest for disturbing the peace. Again, showing you his type of conduct to authority on that particular occasion.

The next one is on May the 27th, 1977 —excuse me, February the 14th, 1977, when Memphis, police officers were called by the Defendant's mother, Ms. Edith Main, with regard to a fight between the Defendant and his girlfriend who had been drinking and had gotten into a fight and the Defendant had a pistol, a .22 caliber pistol in his right front pocket. And the police were summoned at the request of his mother to that location. The Defendant was arrested on that occasion, again, with a pistol in his pocket, involving a dispute with a young lady, his girlfriend.

The next one is May the 27th of 1977, again in Memphis, when the Defendant was arrested for common assault involving the address of 2043 Peabody where Mr. Cox and Mr. Barkhurst (phonetic spelling), two men, complained to the police at that address that the Defendant had pulled a shotgun on them when they attempted to aid a young woman who was screaming because she was being struck by the Defendant. At the time she was being struck the two men noticed it. She was screaming for help, they go over, the Defendant pulls a shotgun on them. And the Defendant was

arrested at that time for common assault.

Then the other one is a 10–3—the last one of the six is 10–3–77, again involving drunk, disorderly—and disorderly conduct where a young female white was being beaten by the Defendant with a large stick and, in fact, according to the statements was on the ground and the Defendant was kicking her while she was on the ground. This was observed by another young lady who was at the scene. The Defendant was arrested at the time and found in the—near where the scene had happened, was a purse, the lady's purse with the contents spilled out of the purse. Those are the facts of that.

Now, did you know all about these arrests, these six arrests of the Defendant and the facts of these arrests before today?

A. No, I did not.

Q. All right. Does that give you some further insight into the character of the Defendant?

A. It gives me further insight. It does, yes.

Q. And having this information, and assuming for the moment that these are accurate and that this is true, would that change your opinion in any way with regard to what you've told these ladies and gentlemen about the Defendant?

A. It does not change my opinion. What it does, it only reinforces what I said earlier in that he is a product of his environment.

■ This Court has heretofore held that arrests and indictments are generally inadmissible. See State v. Miller, 674 S.W.2d 279 (Tenn.1984) [State v. David Earl Miller, released from Knoxville, May 29, 1984] and State v. Teague, 645 S.W.2d 392 (Tenn.1983). As we indicated in Miller, there are instances where arrests may become admissible. It is permissible to allow reasonable latitude for testing the basis of an expert opinion but when that involves the use of otherwise inadmissible and highly prejudicial evidence, the trial judge must balance the probative value of the proffered evidence against the prejudicial effect upon defendant.

■ In the instant case, no valid basis for the introduction of any of the arrest reports existed because Dr. Wilks had not in fact based his testimony on the scope of defendant's criminal activities. The fact that he acknowledged that it was important that he know the facts about defendant's life does not negate the statement that his opinion was not predicated on the scope of defendant's criminal activities. The absolute maximum of information that the State was entitled to use with respect to arrest reports to test Dr. Wilks' opinion was the dates of the arrest and the bare charges such as DWI, carrying a pistol, disturbing the peace, etc. The highly prejudicial error in allowing the prosecutor to read the information from the reports as though they were established fact was further compounded by the prosecutor's argument at the sentencing hearing "How many other times before has he gotten drunk and committed violent acts?" These errors require a new sentencing hearing.

■ Defendant asserts that the trial judge erred in refusing to allow two employees of the sheriff's department to testify about defendant's conduct since his incarceration. This evidence was clearly admissible. See Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973 (1978).

Defendant complains of error with respect to six specific instructions requested and refused by the trial judge. We find that the first five of the requested instructions were covered in the Court's charge. The sixth requested instruction dealt with criminal intent and was entirely irrelevant at the sentencing stage of the case.

■ Defendant complains of the charge that the trial judge gave with respect to the aggravating circumstance that the murder was especially heinous, atrocious or cruel in that it involved torture or depravity of mind. The trial judge charged the

language of the statute and then defined each of the words "heinous," "atrocious" and "cruel." Apparently defendant's complaint in this Court is that the trial judge did not add what defendant calls the Tennessee definition of this aggravated circumstance for which he cites *State v. Pritchett*, 621 S.W.2d 127 (Tenn.1981), wherein we said in comparing our statute with the Georgia statute that was involved in *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), that "[t]his aggravating circumstance requires evidence that the defendant inflicted torture on the victim before death or that defendant committed acts evincing a depraved state of mind; that the depraved state of mind or the torture inflicted must meet the test of heinous, atrocious or cruel." 621 S.W.2d at 139.

We did not say in *Pritchett* nor in any other case that that language must be included in a jury instruction nor did defendant submit a request to the trial judge that he do so, nor did he include this issue in his motion for new trial. This issue has no merit.

Defendant says the trial court erred in failing to grant a new trial because of newly discovered evidence. At the hearing on the motion for new trial defendant produced an inmate of the Shelby County Jail who testified that Haning had said "I'll cut your throat like I cut that bitches'." This evidence merely contradicts or attempts to impeach Haning's testimony at trial and is unlikely to produce a different result. We find no abuse of discretion on the part of the trial judge in denying a new trial on the basis of this flimsy discovery.

We affirm the verdict and judgment finding defendant guilty of murder in the first degree, reverse the death sentence and remand this case to the trial court for a resentencing hearing.

COOPER, C.J., and BROCK, HARBISON and DROWOTA, JJ., concur.