IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT NASHVILLE

AUGUST 1996 SESSION



FILED

July 30, 1997

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | |
| Appellee, | ) | No. 01C01-9505-CR-00155 |
| | ) | |
| | ) | Davidson County |
| v. | ) | |
| | ) | Honorable Seth Norman, Judge |
| | ) | |
| EDWARD M. THOMPSON, | ) | (First Degree Murder and Especially |
| | ) | Aggravated Robbery) |
| | ) | |
| Appellant. | ) | |

For the Appellant:

Larry B. Hoover
500 Church Street
Nashville, TN 37219

For the Appellee:

Charles W. Burson
Attorney General of Tennessee
              and
Clinton J. Morgan
Counsel for the State
450 James Robertson Parkway
Nashville, TN 37243-0493

Victor S. Johnson, III
District Attorney General
              and
Kymberly Hattaway-Haas
Assistant District Attorney General
Washington Square
222 2nd Avenue North
Nashville, TN 37201-1649

OPINION FILED:_____

AFFIRMED

Joseph M. Tipton
Judge

**O P I N I O N**

The defendant, Edward M. Thompson, appeals as of right from his convictions by a jury in the Davidson County Criminal Court for first degree murder and especially aggravated robbery, a class A felony. He received a life sentence for the murder and as a Range I, standard offender a concurrent eighteen-year sentence for the especially aggravated robbery conviction. The defendant presents the following issues for our review:

> (1) whether the evidence is sufficient to support his felony murder conviction;
>
> (2) whether the court erred by excluding the victim's prior convictions.
>
> (3) whether the prosecuting attorney committed prosecutorial misconduct by referring to inadmissible evidence during her closing argument.

We affirm the judgments of the trial court.

The defendant was charged with the felony murder and especially aggravated robbery of Maurice Jordan. At trial, Officer David Debout of the Nashville Metropolitan Police Department testified that he found the victim lying on an interstate ramp at 10:35 p.m. on June 11, 1993. He recalled that the victim's body was half on the ramp, across the white line, and half on the shoulder. He noticed small holes in the victim's back. He checked for other evidence at the scene but found nothing.

Sean Jackson, a friend of the victim, testified that the victim house-sat for him while he was out of town in June 1993. Jackson admitted that he was involved in selling drugs during that time. He said that he had given the victim his pager in case anyone called about a drug deal. He estimated that three ounces of cocaine would have sold for $3,000 to $3,500 and said that he doubted that he would have been able to obtain such a large amount of cocaine.

2

The victim's mother testified that she last saw the victim four days before his death, when she and the victim's father had let the victim use their Chevrolet Blazer. She said that the victim was respectful of their property and that he would not have allowed anyone else to drive it. She said that she received the Blazer back after the victim's death and did not find any evidence that a weapon had been fired in it. She also recalled that the victim's wallet did not have any money in it when she received it after the victim's death. She testified that the victim had been in trouble for selling drugs when he was nineteen-years old but that to her knowledge he did not continue to sell drugs after that time.

Michael Steel, a friend of the defendant's, testified that he was living at the defendant's sister's apartment in June 1993. He recalled that the defendant and Michael Gordon came to the apartment between 11:00 p.m. and midnight on June 11, 1993. He said that they had a cellular phone and a white powdery substance that appeared to be cocaine. He said that he saw the defendant use the phone and that the defendant told him that he got the phone from a Blazer on an interstate exit. Steel testified that he did not recall telling Detective Pridemore that the defendant told him that the defendant had set up, robbed, and killed a man named Maurice. He said that he remembered telling Detective Pridemore that both the defendant and Gordon had guns at the time of the shooting. He also recalled that he saw the defendant driving a Blazer three or four days after the shooting and that the defendant told him that he had sold the cellular phone.

On cross-examination, Steel testified that he only heard the defendant say something about a robbery. He said that the defendant did not tell him that he set up, robbed, and killed a man.

3

The defendant's girlfriend testified that she saw the defendant with a dark-colored Blazer, a cellular phone and a lot of money after June 11, 1993. She recalled that the defendant purchased clothes with the money and said that it was unusual for the defendant to have a lot of money. She said that the defendant told her that the Blazer belonged to a friend and that he had bought the cellular phone. She recalled that the defendant gave her the cellular phone to use while he went vacationing in Florida with his family for approximately a week. She said that the defendant took the phone from her after he returned from his trip.

Officer Greg Adams of the Nashville Metropolitan Police Department testified that he was at the Litton Avenue Apartments between 11:20 and 11:30 p.m. on June 11, 1993, when he saw Michael Gordon drive up in a dark blue Ford. He testified that Gordon left the car when he began to approach. Officer Adams said that he tried to arrest Gordon because he thought he saw drugs in the car. He said that he and Gordon fought and that Gordon eventually got away from him. He searched the car and found scales, a pillowcase with two fully loaded hand guns in it, and a small amount of a substance that appeared to be crack cocaine. The guns, a thirty-eight revolver and a twenty-five millimeter semi-automatic pistol, were introduced at trial. Officer Adams testified that the substance he found later tested negative for cocaine.

A T.B.I. Forensic Scientist testified that both the pistol and revolver were functioning properly. He also identified three spent bullets that he determined had been fired from the pistol.

Detective Bill Pridemore testified about his investigation into the shooting. He subpoenaed the victim's phone records and learned that the victim's phone had been used hundreds of times since the victim's death. He said that the last call the victim placed on the phone was at 10:05 p.m. on the night of the shooting and that

4

another call was made that night at 10:38 p.m.   As a result of his review of the phone records, Detective Pridemore interviewed Michael Steel on July 19, 1993.  Steel gave the detective the defendant's and Michael Gordon's names.  Detective Pridemore said that he left his card and beeper number with Steel and told him that he wanted to talk to the defendant.

Detective Pridemore testified that the defendant contacted him on the beeper later that day. When he returned the call, the defendant answered the phone and identified himself.  Detective Pridemore said that the defendant admitted to him that he had shot a man and agreed to turn himself in the next morning.  Detective Pridemore said that the defendant did not claim that the shooting was in self-defense during the phone conversation.  When the detective met with the defendant the next day, the defendant waived his Miranda rights and gave a video-taped statement.   The statement was played for the jury.  In it, the defendant admitted that he shot the victim but said that he did so in self-defense.

Dr. Charles Harlan, the Chief Medical Examiner of the State of Tennessee, testified that the victim died as the result of three gunshot wounds he had received.   Dr. Harlan identified the three bullets he recovered from the body.  He explained that one of the victim's wounds was caused by a gun being fired more than twenty-four inches away from the victim.  He said that the bullet entered the body slightly inside the left shoulder blade, fifty-five and a half inches above the victim's heel and two inches left of his midline.  According to Dr. Harlan, the bullet traveled through the victim's left lung and was recovered in the lateral left chest wall.  He said that the bullet had traveled downward two and a half inches to fifty-three inches above the victim's heel.

5

Dr. Harlan described another of the victim's wounds as being caused by a shot that was fired from a distance of four to eight inches away from the victim. He said that the bullet from that shot entered the defendant's back fifty-one and a half inches above his heel and four and a half inches left of his midline. It traveled through the defendant's left lung, left ventricle of his heart, diaphragm and pericardial sac. The bullet was recovered from the chest wall and had traveled upward two and a half inches to fifty-four inches above the victim's heel.

The third wound Dr. Harlan described was caused by the gun being fired from between twelve to twenty-four inches away from the victim's body. The shot entered the victim's back forty-eight and a half inches above his heel and to the right of his midline. According to Dr. Harlan, the bullet traveled from left to right and downward three and a half inches, completing its travel at forty-five inches above the victim's heel.

Dr. Harlan also identified pictures showing the gunshot wounds and other scrapes and abrasions on the victim's body. Harlan explained that the outside area of the victim's right elbow and the middle portion of his left forearm contained abrasions that were consistent with the victim's body being scraped across some firm surface such as an asphalt road. The victim had similar areas of abrasions on his knees, right shoulder, and on his left hand and wrist.

The defendant testified consistently with the statement he had given Detective Pridemore. He recalled that he paged the victim to buy four ounces of cocaine. He said that the victim agreed to meet with him at a McDonald's restaurant and indicated that he had the cocaine. The defendant said that he and Michael Gordon went to McDonald's in his sister's car and that the victim arrived driving a Blazer and parked next to them. The defendant said that he and Gordon got into the Blazer and that the victim told him that they needed to get the cocaine. The defendant recalled

6

that he sat in the back seat of the Blazer and that Gordon sat in the front seat. He said that Gordon had a pillowcase with a set of scales in it.

The defendant testified that he, Gordon, and the victim left McDonald's in the Blazer with the victim driving. He said that the victim pulled out an old, rusty revolver while he was driving and ordered Gordon and the defendant to empty their pockets. The defendant said that he complied and placed his money on the Blazer's console. He recalled that the victim was pointing a gun at Gordon but was watching him through the rear-view mirror. He said that the victim drove into a Krystal's parking lot and ordered Gordon to drive. The defendant said that the victim walked around the Blazer and got in on the passenger side. The defendant testified that he pulled out an automatic pistol he had with him and covered it with his hand while the victim walked around the front of the Blazer. He said that the victim ordered Gordon to get on the interstate.

According to the defendant, the victim sat sideways in the passenger seat and watched Gordon and him. The defendant said that the victim turned as they approached the interstate and that the victim leaned forward when he turned back. The defendant testified that he shot the victim around five times when the victim leaned forward. He said that the victim opened the door when he started shooting and jumped out of the Blazer.

The defendant recalled that Gordon dropped him off after the shooting and that he used the victim's phone to call someone to get him. He said that he went back to McDonald's to get his sister's car and then went to his sister's apartment. Gordon was at the apartment when he arrived. He said that Gordon told him that he had found some cocaine in the Blazer. The defendant said that he and Gordon went to the Blazer to split up the cocaine but discovered that it was not real. He testified that he

7

saw Gordon again later that night, after Gordon had been chased by a police officer. He said that Gordon informed him that the police had been after him and that he had left the pistol in his car.

The defendant testified that he shot the victim because he thought the victim was going to kill him and Gordon. He said that he did not shoot the victim at Krystal's when he was getting into the Blazer because he was afraid that the victim would shoot him back. The defendant explained that the twenty-five millimeter pistol he used in the shooting belonged to Gordon. He said that he and Gordon both usually carry a nine millimeter pistol but that he had borrowed Gordon's smaller pistol that night because he was wearing shorts. The defendant testified that he had not seen Gordon carry a revolver since he was fifteen or sixteen years old.

The defendant recalled that Gordon called him two or three days after the shooting and drove the Blazer to get him. The defendant admitted that he drove the Blazer some and eventually left it in West Nashville. He also admitted that he and his girlfriend used the victim's phone a lot.

During cross-examination, the defendant testified that the revolver that had been introduced into evidence may have been the one the victim used on the night of the shooting. Although he had testified that the victim had used a rusty revolver, he admitted that the revolver that was in evidence only had rust in its chamber and around its barrel. He explained that he saw the rust on the victim's gun when the victim got out of the Blazer at Krystal's. He recalled that the victim had the gun in his hand when he was shot but testified that he did not know what happened to the gun when the victim left the truck. He said that he did not tell the police, Michael Steel, or his girlfriend immediately after the shooting that he had shot a man in self-defense.

# I

The defendant contends that the evidence is insufficient to support his conviction for first degree murder because the proof established that he acted in self-defense. We disagree. Although the defendant claimed that he was forced to shoot the victim after the victim, while driving the Blazer, robbed both him and Michael Gordon at gunpoint, the jury obviously did not accredit this version of events.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). This means that we may not reweigh the evidence, but must presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

When viewed in this light, the proof at trial showed that the defendant and Michael Gordon met with the victim. The defendant shot the victim three times in the back, and he and Gordon took the Blazer that the victim had been driving. The defendant then used the victim's phone to make arrangements to pick up the car he had driven to meet the victim. Once he reached the car, he drove to his sister's apartment where he reunited with Michael Gordon to share any drugs that were found in the Blazer. After the shooting, the defendant possessed an unusually large amount of money, used the victim's phone extensively, and drove the Blazer. Under these facts, the jury was justified in finding that the defendant killed the victim during a robbery and not in self-defense. We hold that sufficient evidence supports his first degree murder conviction.

## II

The defendant also contests the trial court's failure to admit the victim's prior drug convictions. The trial court excluded the convictions because it concluded that they were irrelevant because their probative value was too speculative. We agree with the trial court's assessment.

The defendant contends that the victim's convictions were relevant to show that the victim was a drug dealer who was capable of selling a large amount of cocaine. He argues that the victim's ability to obtain large quantities of cocaine supports his theory of the case that the victim decided to rob him and Michael Gordon because he did not have enough cocaine to fulfill the transaction.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. In our view, the victim's prior drug convictions do not meet this test. We disagree with the defendant's assertion that the victim's prior drug convictions have any tendency to show that the victim was unable to obtain drugs on the night of the shooting or that the victim tried to rob the defendant and Gordon. The trial court properly excluded the convictions.

## III

Next, the defendant contends that the prosecuting attorney committed prosecutorial misconduct during her closing argument by referring to excluded evidence. The trial court sustained the defendant's objection to Detective Pridemore testifying about what Michael Steel had told him regarding the defendant's statements on the night of the shooting. During closing argument, the prosecuting attorney stated the following:

> Now, Michael Steel refused to admit to you, he said he didn't remember that he had told Detective Pridemore within days of the murder that Mr. Thompson told him that he had "set up, robbed and killed a man" at this exact area. He said "I don't remember telling him that." He did say, "I remember telling Detective Pridemore that Mr. Thompson told me that Mr. Gordon and Mr. Thompson each had a weapon."

The defendant asserts that these comments were designed to convey to the jury that, had the trial court not stopped him from doing so, Detective Pridemore would have testified that Steel told him that the defendant admitted that he had set up, robbed and killed a man.

Initially, we note that the defendant failed to object to the closing argument at trial and has thus waived the issue. See T.R.A.P. 36(a). In any event, the defendant also failed to object when the prosecuting attorney asked Steel whether he told Detective Pridemore that the defendant admitted that he had set up, robbed, and killed a man. In this respect, the prosecutor's reference to Steel's inability to recall making such statements was a permissible comment on the evidence that did not constitute misconduct. To the extent the state was summarizing the testimony at trial, the argument was entirely proper.

On the other hand, we recognize that the prosecutor's statement that Steel "refused to admit" that he told Detective Pridemore that the defendant confessed could be interpreted as an attempt to tell the jury that Steel did tell Detective Pridemore that the defendant made such statements. However, the ultimate issue is not whether the argument may be viewed as improper, but whether the jury could consider the defendant's case with impartiality despite the allegedly improper remark by the prosecutor. See Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976). In considering the evidence presented, and the relatively innocuous statements in question in relation to the remainder of the argument, we conclude that the defendant did not suffer improper prejudice.

11

In consideration of the foregoing, and the record as a whole, the judgments of conviction are affirmed.

_____
Joseph M. Tipton, Judge

CONCUR:


_____
John H. Peay, Judge


_____
David H. Welles, Judge