IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE

Assigned on Briefs December 18, 2001

## STATE OF TENNESSEE v. NELSON TROGLIN

**Direct Appeal from the Circuit Court for Bledsoe County**
**No. 66-1998     Thomas W. Graham, Judge**

**No. E2001-00251-CCA-R3-CD**
**March 12, 2002**

The defendant, Nelson Troglin, was convicted of second degree murder following a jury trial in the Bledsoe County Circuit Court. The trial court subsequently imposed a sentence of twenty-three years. In this appeal, Defendant raises the following issues: (1) whether the evidence was sufficient to support his conviction; (2) whether the trial court erred by ruling that Defendant's statement to the police was admissible as evidence during his trial; (3) whether comments made by the trial court during curative instructions to the jury constituted impermissible expressions of bias toward Defendant, effectively depriving him of his right to a fair trial; (4) whether the trial court erred when it excluded evidence that a person, not Defendant, had assaulted the victim on the day of his death, and when it allowed an expert to testify concerning evidence which was not revealed to Defendant during regular discovery; (5) whether the trial court erred by failing to instruct the jury on the lesser-included offenses of reckless homicide and criminally negligent homicide; and (6) whether the sentence imposed by the trial court was excessive. After a thorough review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed.**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and ROBERT W. WEDEMEYER, JJ., joined.

Howard L. Upchurch, Pikeville, Tennessee, for the appellant, Nelson Troglin.

Paul G. Summers, Attorney General and Reporter; Kathy D. Aslinger, Assistant Attorney General; J. Michael Taylor, District Attorney General; and James W. Pope, III, Assistant District Attorney General, for the appellee, State of Tennessee.

OPINION

## FACTUAL BACKGROUND

The following facts are taken from the evidence adduced at Defendant's trial. (The proof presented at Defendant's suppression hearing is discussed in section II of this opinion.) On June 15, 1998, Harvey Ralph Wilkey, the victim in this case, was discovered dead at approximately 6:30 p.m. on the floor of the bedroom in his residence on Highway 30 in Pikeville, Tennessee. Wilkey was in the business of selling alcoholic beverages at his home. His body was first discovered by a neighbor, Richard Stafford, who had stopped by to make a purchase. Upon finding the body, Stafford immediately dialed 911. The first person to respond was Tony Richardson, a paramedic with the Bledsoe County Ambulance Service, who arrived at 6:52 p.m. Richardson reported that Wilkey's body was positioned face down, with his knees bent up underneath his abdomen and the right side of his face lay on the floor. Wilkey was not breathing and no pulse was evident, but his body was still warm and rigor mortis had not set in. Richardson straightened out the body in preparation for rolling it over to initiate CPR. At this point, he discovered blood on Wilkey's shirt and numerous puncture or exit wounds around the right kidney area. Richardson telephoned for additional police assistance and cleared the area of bystanders. Local law enforcement arrived a few minutes later.

David Emiren, the Tennessee Bureau of Investigation ("TBI") agent assigned to Bledsoe County, arrived at the Wilkey residence at 8:00 p.m. By that time, local police had secured the crime scene area, and Sheriff Swafford of Bledsoe County and Assistant District Attorney Jimmy Pope were also present. Wilkey's body remained face down on the carpet until Agent Emiren's arrival. Agent Emiren noted three wounds in the victim's back, where the shirt covering this area had been pulled up by the paramedic. Agent Emiren then rolled the body over and observed that the right pocket of Wilkey's blue jeans was empty and turned inside out. In a different pants pocket, he found more than $400. Later, Wilkey's half-sister, Nannie Lou Troglin, informed Agent Emiren that she had observed Wilkey place a "large amount of money" into his right front pocket on the day he died.

Agent Emiren observed an unloaded Mossberg 20 gauge shotgun standing in the corner of the bedroom. It was the only weapon in the immediate vicinity of the body. Located on the wall directly adjacent to the shotgun were three bullet holes. Four expended 9 mm Winchester Luger hulls were also discovered in various areas of the bedroom: one in a corner of the room, one under the bed, and two more lying on the window sill. A subsequent autopsy revealed that Wilkey had been shot four times. Three bullets completely penetrated the body, and one bullet had remained lodged in the left buttock.

Meanwhile, William Angel, an investigator with the Bledsoe County Sheriff's Department, had been instructed to assist with the murder investigation by conducting interviews of the witnesses uncovered thus far. Officer Angel arrived at the Sheriff's Office at approximately 8:00 p.m. on June 15, 1998. He began by interviewing Richard Stafford, the neighbor who reported discovering Wilkey's body, and the persons who were with him at that time: Stafford's girlfriend, Susan Joyner;

a man named Lonnie Angel, Sr. (no relation to the interviewer); Angel's son, Lonnie Angel, Jr.; and Angel's brother, also known as "Cuckoo." Thereafter, Officer Angel also interviewed Mike Stafford, Richard Stafford's brother; Virginia Wright, who also lived on the property adjacent to Wilkey's residence; Christy Luttrell, Virginia's daughter; and Christy's boyfriend, Ron Sullivan.

Richard Stafford, Christy Luttrell, and Ron Sullivan all reported observing a vehicle similar to Defendant's parked in the driveway of Wilkey's house at approximately 5:00 p.m. on the day his body was discovered. The witnesses noticed the vehicle as they drove by Wilkey's house on their way to town. Defendant drove a distinctive vehicle at that time: a reddish-brown or "maroon" Dodge with black stripes extending from the front of the hood to the rear of the car on both sides. All three witnesses further claimed that the vehicle was still there when they returned. According to the testimonies of Luttrell and Sullivan, the time was shortly after 6:00 p.m. Additional witnesses, Mike Stafford and Virginia Wright, confirmed the presence of the maroon vehicle at Wilkey's house on June 15, 1998. Mike recalled noticing the vehicle between 5:30 and 6:00 p.m. Virginia recalled observing the car sometime after 5:00 p.m. Mike was familiar with the vehicle and positively identified the car he saw at Wilkey's as belonging to Defendant. Nannie Lou Troglin, half-sister of the victim and a sister-in-law of Defendant, also observed Defendant's vehicle parked at Wilkey's house on the day of the murder, but was unable to state with any certainty what time it had arrived or departed. Officer Angel was further informed by numerous witnesses that Wilkey sold liquor and, thus, it was not uncommon for a variety of vehicles to be parked at his house.

After Richard Stafford, Christy Luttrell, and Ron Sullivan returned from town, Richard and his girlfriend, Susan Joyner, walked to Wilkey's house to pick up some liquor. The time was approximately 6:30 p.m. Richard testified that he "pecked" at the door and they both walked in, as was customary for them. Richard sat down at the bar. Susan sat at a table. Wilkey was not present. Shortly thereafter, Lonnie Angel Sr. appeared with his two sons, also wanting to purchase alcohol. Richard telephoned Wilkey's sister in an attempt to locate Wilkey. She replied that he was not with her and instructed Richard to look around. Richard walked into Wilkey's bedroom and discovered him "humped over" in the corner, apparently dead. Richard dialed 911, checked for a pulse, and stayed until the ambulance arrived.

At the conclusion of his interviews on June 15, 1998, Officer Angel attempted to locate the maroon vehicle that was reportedly parked at the victim's home on the day of the killing and matched a description of Defendant's Dodge. He arrived at Defendant's brother's residence at 11:00 p.m. that night. Defendant and his vehicle were both present, and Defendant had not yet retired for the evening. Officer Angel explained to Defendant that Wilkey had been killed. Defendant appeared surprised. Officer Angel informed Defendant that Sheriff Swafford would like to speak with him and asked Defendant to accompany him to the Sheriff's Department for this purpose. Officer Angel advised Defendant that no arrest warrant had been issued and that Defendant was not required to go with him. Defendant agreed to accompany Officer Angel and asked to bring a few beers with him. It was apparent to Officer Angel that Defendant had been drinking and he refused permission. Defendant accompanied him anyway.

TBI Agent Emiren had completed his investigation of the crime scene and was present when Officer Angel and Defendant arrived at the Sheriff's Department. The time was 12:30 a.m. on June 16, 1998. Emiren conducted Defendant's interview and testified at trial that he did not read Defendant the Miranda warnings because the interrogation was not "custodial," and Defendant was not under arrest at that time.

During the interview which ensued, Defendant gave Agent Emiren a statement concerning his activities on June 15, 1998, which Emiren read to the jury at trial. The statement contained the following facts: Defendant worked from 4:00 a.m. to 8:00 a.m. Thereafter, his niece, Teresa Smith, drove him to see Dr. Francis Labuffe, for the purpose of obtaining medication to treat Defendant's "nervous condition." Defendant was uncertain what time he and Teresa returned, but he claimed that he was drinking beer with two friends named Billy and Janice Billingsley at approximately 2:30 p.m. Later (the exact time again unspecified), Defendant drove to a store known as "Nyla's Place," where he purchased "22 longs" (22 caliber ammunition). Defendant specifically stated: "I did not buy any 9 millimeter shells. I do not own or have I ever owned a 9 millimeter gun." After twenty-five minutes at the store, Defendant claimed that he returned to the Billingsley's house and stayed until 7:00 p.m. Thereafter, Defendant drove to visit two friends named Jim and Linda Evans. At this point, Defendant had imbibed too much alcohol to drive safely. Jim gave him a ride home, sometime between 8:00 and 8:30 p.m. Linda followed the two men in Defendant's car. Defendant stated that when he arrived at home, he went directly to bed.

In his statement, Defendant admitted that he had played poker a number of times during the two week period prior to the murder and that he had cash in his possession. Agent Emiren asked how much cash he was carrying, and Defendant showed him $639 in currency: two 100-dollar bills, sixteen 20-dollar bills, two 10-dollar bills, eight 5-dollar bills, and fifty-nine 1-dollar bills. Emiren requested permission to photocopy the currency, but Defendant refused and put it back into his pocket.

When Defendant finished his statement, he requested a lawyer. Agent Emiren responded by handing him a telephone book. Emiren did not state whether Defendant attempted to telephone anyone. During cross-examination at trial, Defendant's counsel asked Emiren whether he was aware that Defendant was illiterate. Emiren replied negatively. Defendant's counsel also questioned Emiren regarding Defendant's state of intoxication. Emiren testified that, although Defendant appeared to have been drinking alcohol earlier in the evening, he behaved rationally throughout their conversation.

At approximately 1:30 a.m., Officer Angel drove Defendant back to his brother's residence. When they arrived, Officer Angel asked permission to search Defendant's vehicle and take some photographs. Defendant consented. Officer Angel testified that he was searching for 9 mm weapons and ammunition. He discovered only a .22 caliber rifle and one box of .22 caliber ammunition. Defendant also consented when Officer Angel requested to search his residence. This search similarly failed to reveal any 9 mm weapons or ammunition.

During the investigation which followed Wilkey's murder, law enforcement learned from various sources that (1) Defendant had owned a 9 mm semiautomatic rifle, (2) he had purchased shells for the weapon, and (3) he had fired it on at least two separate occasions. One such source was Norman Blaylock, an acquaintance of Defendant's. Blaylock testified at trial that he encountered Defendant and a man named Ted Fugate by "chance" on June 14, 1998, as he was traveling up the road toward Brockdale Mountain. Defendant and Fugate informed Blaylock that they had recently won some money playing poker and wondered whether he "had anything to trade on." Blaylock replied that he had guns and land to trade. The two men followed him back to his house where Blaylock sold a 30-30 Winchester lever action rifle to Fugate and a 9 mm semiautomatic Marlin rifle to Defendant. Blaylock recalled giving ammunition for both weapons to the men and that Defendant test-fired them both in front of Blaylock's house. The ammunition "hulls" were expelled onto the ground and, as far as Blaylock knew, they remained there until an investigator from TBI came to collect them.

Roger Hodge, co-owner of a small Pikeville store referred to as "Nyla's Place," testified that at approximately 5:00 p.m. on June 15, 1998, Defendant came to his store searching for ammunition cartridges similar to the cartridges he brought with him, which were 9 mm. Defendant told Hodge that "he'd traded for an old gun and was going to try it out." Hodge had only one box of Winchester 9 mm shells in the store and sold them to Defendant for $20. Defendant seemed disturbed and asked to speak with Hodge privately. When they were alone, Defendant confided that he had just been diagnosed with cancer. A few minutes later, a friend named Jerry Tullis joined the two men and bought Defendant a six-pack of beer. Then the store became busy, and Hodge left to work the counter. According to Hodge's recollection, Defendant had remained at his store for a total of fifteen to thirty minutes.

Bob Smith, another acquaintance of Defendant's, testified at trial that on June 14, 1998, Defendant came to his house wanting to trade a 9 mm gun for one of his cars. Bob's wife, Helen, brought the firearm, a 9 mm rifle, into the house and showed it to him. Bob was not interested, but he walked out onto the porch and asked Defendant "if it shot good." Defendant responded by shooting the rifle into the air two or three times. Still uninterested, Bob went back into his house. At trial, Bob conceded that he did not recall any details concerning the rifle, other than the fact that it was a 9 mm weapon. Consequently, he was unable to identify Defendant's weapon from the diagrams showed to him at trial. His wife Helen, however, recalled the rifle and also testified at trial. When showed a diagram of a Marlin "Model 9 Camp Carbine, 9 mm Semiautomatic," Exhibit 24, she identified this specific rifle as the type Defendant brought over and fired in their front yard. A few days later, investigators from the TBI expressed interest in the expended hulls, and Helen showed the agents where Defendant was standing when he fired the weapon. The agents discovered and removed two 9 mm hulls from their property.

The murder weapon in this case was never recovered. Steve Scott, a TBI Crime Laboratory investigator assigned to the firearms identification section, examined the three bullets recovered from the wall of Wilkey's bedroom and the single bullet recovered from Wilkey's body. According to the results of Scott's analysis, all four bullets were fired from the same 9 mm weapon. When asked

for his opinion regarding what brand of manufactured weapon might have fired the bullets, Scott gave the names of two manufacturers, one of which was the Marlin Firearms Company. Scott also analyzed the four expended Winchester cartridges recovered from the crime scene, the six expended cartridges recovered from the Blaylock residence, and the two expended cartridges recovered from the Smith's front yard. The test results revealed that all twelve cartridges were fired from the same weapon.

Dr. Charles W. Harlan, a specialist in the areas of anatomic, clinical and forensic pathology, testified at trial that he performed the autopsy on Wilkey. Dr. Harlan's examination revealed four entry bullet wounds to the anterior chest and abdomen, and three exit wounds on the back of the same area. All four bullets had traveled from the front to the back of the victim's body and all of the bullets' paths were angled slightly downward. The bullet which did not exit the body was lodged in the left buttock. The first bullet passed through the heart, esophagus, and liver; the second passed through the stomach, liver, and abdominal aorta; the third passed through the heart, liver, right kidney and aorta; and the fourth, which remained in the buttock, did not penetrate any vital organs. Dr. Harlan testified that, of the first three wounds described, any one would have been capable of causing death, even if Wilkey had received medical attention within a reasonable period of time after the injury. Given the anatomical structures damaged, Dr. Harlan further concluded that Wilkey had bled to death internally within four to five minutes of receiving the injuries. In addition, Dr. Harlan reported that all blood and urine tests showed negative results for alcohol and drugs, and no defensive wounds were discovered. Dr. Harlan was unable to estimate the time of death. However, Billy F. Wheeler, the County Executive of Bledsoe County, testified that he encountered Wilkey at the post office on June 15, 1998 at approximately 4:30 p.m.

The investigators also spoke with Richard Wooden, who regularly played poker at a local game room which Defendant frequented. Consequently, Wooden was acquainted with Defendant, Wilkey, and most of the local residents who enjoyed this particular pastime. Wooden testified that, on June 13, 1998, he was playing cards with Wilkey, Defendant, and a man named Dennis Johnson. During the course of the game, Defendant asked Wooden to meet him in the hall. When Wooden complied, Defendant asked to borrow Wooden's gun so that he could rob Wilkey of his money. Wooden wanted no part of Defendant's plan and responded that, if Defendant wanted Wilkey's money, he should ask him for it and Wilkey would probably give it to him. Wooden rejoined the game, but Defendant called him back into the hall two more times that evening. On one occasion, Defendant suggested that Wooden offer Wilkey a ride home and then stop at some prearranged point so that Defendant could rob him. Wooden repeated that he wanted nothing to do with Defendant's scheme. Defendant responded, "I'm killing that son-of-a-bitch and I'll get that money." The next day, Wooden saw Defendant with Fugate and Blaylock. Monday, June 15th, Wooden went to work. Arriving at the game room at approximately 6:30 p.m. that evening, Wooden learned that Wilkey had been shot. Some time later, Defendant also visited the game room. When he learned of Wilkey's death, he threw a twenty-dollar bill on the counter and said, "There's the son-of-a-bitch some flowers." Wooden confessed that he had told no one of his June 13 conversation with Defendant until after Wilkey was killed.

Defendant did not testify at trial, but presented an alibi defense through the testimonies of various witnesses. Teresa Smith, Defendant's niece, testified that she drove Defendant to see his doctor at the Johnson's Mental Health Center in Dayton, Tennessee, on June 15, 1998. Afterward, she claimed that she and Defendant ate lunch and returned to the home of her mother, Willadean Smith, who is also Defendant's sister. Teresa was unsure of the exact time they returned home, but was certain that it was after 3:00 p.m. because her son was out of school.

Dinah Smith, another niece of Defendant's, testified that she was at the home of her mother, Willadean, when Defendant and Teresa left for Dayton on the morning of June 15, 1998. Dinah recalled that Defendant returned at approximately 3:00 p.m., stayed thirty minutes, and then left to fill his Xanax prescription. He returned a few minutes after 4:00 p.m., and then left to visit someone named Billingsley. Defendant returned to Willadean's again, sometime between 5:00 and 5:15 p.m., and said he needed some sleep. He then laid down on the living room couch and asked his nephew, Scotty, to wake him up at 6:30 p.m. Defendant slept until 6:30 p.m., at which time Scotty woke him up. Defendant stayed at Willadean's for approximately ten more minutes, and then he left to visit friends named Jim and Linda Evans.

The testimonies of Willadean Smith and Scotty Smith, Defendant's sister and nephew, respectively, corroborated the testimony of Teresa and Dinah in all pertinent aspects. Significantly, Willadean and Scotty both attested that Defendant was asleep on Willadean's couch from approximately 5:00 p.m. until at least 6:30 p.m., when he left to visit friends. Linda Evans testified that Defendant arrived at her home at approximately 7:15 p.m. and that her husband drove him home at 8:30 p.m. because he had been drinking. She also claimed that she followed her husband in Defendant's car--a red Dodge with black stripes.

## ANALYSIS

### I. Sufficiency of the Evidence

Defendant first submits that the State's case was devoid of direct evidence implicating him in the crime and that the proof is insufficient as a matter of law to sustain his conviction. We disagree.

When evidentiary sufficiency is questioned on appeal, the standard of review is whether, after considering all the evidence in the light most favorable to the State, any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 318-319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999); Tenn. R. App. P. 13(e).

In determining the sufficiency of the evidence, we will not reweigh the evidence or substitute our own inferences for those drawn by the trier of fact. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Instead, on appeal, the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate

inferences that may be drawn therefrom. Hall, 8 S.W.3d at 599. A guilty verdict by a jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory, effectively removing the presumption of innocence and replacing it with a presumption of guilt. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions concerning the credibility of witnesses, the weight and value of evidence, and factual issues raised by the evidence are matters to be resolved by the trier of fact, not this Court. Id. The defendant bears the burden of demonstrating that the evidence is insufficient to support his or her conviction. State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The standard for appellate review is the same whether the conviction is based upon direct evidence, circumstantial evidence, or a combination of both. State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998) (citing State v. Tharpe, 726 S.W.2d 896, 899-900 (Tenn. 1987)). However, where a conviction is based upon entirely circumstantial evidence, the facts and the circumstances "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971). Put another way, a conviction based entirely on circumstantial evidence requires that the facts be "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone." State v. Smith, 868 S.W.2d 561, 569 (Tenn. 1993) (quoting State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985)).

To convict a defendant of second degree murder, the State must prove beyond a reasonable doubt that the defendant unlawfully killed the alleged victim and that the defendant acted knowingly. See Tenn. Code Ann. § 39-13-210(a)(1) (1997). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Id. § 39-11-302(b).

The evidence presented at trial revealed that Wilkey was killed with a 9 mm firearm and, although Defendant made a statement wherein he denied ever owning such a weapon or buying ammunition for same, the testimonies of Norman Blaylock, Bob Smith, and Roger Hodge indicated otherwise. The proof also showed that the Winchester 9 mm cartridges discovered in the room with the victim's body were expended from the 9 mm firearm possessed by Defendant and that these cartridges were similar to both the type of ammunition purchased by Defendant earlier that day and the size of the bullets used to kill the victim.

Additionally, Defendant's account to law enforcement officials of his activities on June 15, 1998 was not consistent with the testimony of numerous witnesses. Importantly, Defendant's account did not include a visit to Wilkey's. Yet, six witnesses testified that Defendant's vehicle was parked at the victim's house. Granted, the testimony of these six witnesses conflicts with the testimony of Defendant's two nieces, his nephew, and his sister, all of which reported that Defendant was asleep on his sister's couch during the approximate period of time that his car was observed at the victim's residence. However, the determination of the weight and credibility of the testimony of witnesses and reconciliation of conflicts in that testimony are matters entrusted exclusively to the

trier of fact, not this Court. State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). Similarly to any other fact at trial, the testimony presenting an alibi defense constitutes an issue determinable by the jury. Smith v. State, 566 S.W.2d 553, 556 (Tenn. Crim. App. 1978). In the present case, the jury heard the evidence regarding Defendant's alibi, evaluated the credibility of the witnesses attesting to his brief nap during the time the murder was probably committed, and apparently rejected the defense.

Finally, the proof also indicates that Defendant admitted his desire to rob and kill Wilkey on June 13, 1998, two days before Wilkey was actually killed and, most likely, robbed. The evidence indicates that the killer aimed and fired four bullets into the victim's body, conduct reasonably certain to kill the victim. Such action falls within the definition of "knowing" conduct.

In sum, when the evidence is viewed in the light most favorable to the State, as it must be, we conclude that it was sufficient to find beyond a reasonable doubt that Defendant unlawfully killed the victim, that he acted knowingly, and that no other reasonable hypotheses exist. Defendant is not entitled to relief on this issue.

## II. Admissibility of Defendant's Statement

Defendant contends that the trial court erred by allowing Defendant's statement to TBI Agent Emiren to be admitted as evidence during his trial. Specifically, Defendant argues that he was "in custody" during his conversation with Emiren and, therefore, his statement is inadmissible because he was not read his constitutional rights as required by Miranda v. Arizona, 384 U.S. 436 (1966). Defendant further argues that, even if this Court determines that he was not "in custody" for purposes of requiring Miranda warnings, his statement was nevertheless inadmissible because it was not "voluntary," as contemplated by the Constitution of Tennessee. After a thorough review of the record, we disagree.

The record reveals that, prior to trial, Defendant filed a motion to suppress his statement to Agent Emiren. The matter was heard by the trial court on September 20, 1999. At the suppression hearing, Officer Angel testified that he located Defendant at his brother's residence on Brockdale Mountain at approximately 11:00 p.m. on June 15, 1998. He informed Defendant that Ralph Wilkey had been killed and that Sheriff Swafford "would like to talk to him, if he didn't mind coming down and giving a statement," since a vehicle matching the description of Defendant's Dodge had been observed at the victim's home. Angel testified that Defendant appeared surprised at the news of Wilkey's death and responded that he "didn't mind a bit" going with Angel to the jail. It appeared to Angel that Defendant had been drinking alcohol. Defendant asked to bring a couple of beers with him to the jail. Angel denied his request.

Thereafter, Angel and another officer drove Defendant to the Bledsoe County Jail in the rear of their patrol car, admittedly a "secured" area, because three men would not ride comfortably on the front seat. Angel testified that Defendant was only a "potential witness" at that time, and Angel had informed Defendant that he was not under arrest. On the way to the jail, Defendant told the

officers that they had "better have something good on him or he'd sue the county." In response, Angel informed Defendant a second time that he was not under arrest and that they would "turn around and take him back home if that was what he wanted to do . . . [the Sheriff] just wanted to talk to him because a car like his had been there." Defendant again consented to accompany the officers, if they agreed to give him a ride home afterward. Defendant was not handcuffed, shackled, or physically restrained in any way. The drive to the jail lasted approximately twenty to twenty-five minutes.

When the officers and Defendant arrived at the jail, TBI Agent David Emiren used Angel's office for the interview. Angel testified that he was not present during questioning and, according to his recollection, neither were any other officers. At the conclusion of the interview, Angel and another officer drove Defendant back home. Angel stated that Defendant did not appear dissatisfied or aggrieved during the trip back. When they arrived at Defendant's home, he was "very cooperative" and consented to a search of his vehicle and residence.

Upon cross-examination, Officer Angel testified that transporting Defendant to and from the interview in the patrol car was not unusual--all of the witnesses previously interviewed that evening had been transported in identical fashion. Angel also reported that, at the time Defendant was interviewed, the investigators were uncertain what time the victim was killed. The five witnesses that Angel spoke with had all observed a vehicle similar to that driven by Defendant at the victim's house between the hours of 5:00 and 6:00 p.m., but none had reported seeing Defendant.

TBI Agent Emiren also testified at the suppression hearing. Emiren testified that he was at the Bledsoe County Jail when Defendant arrived with Officer Angel. Emiren was using the telephone in Angel's office at the time. Angel brought Defendant into the office, and Emiren began interviewing him at 12:30 a.m. They talked for a little over an hour, and Defendant's written statement was completed at 1:30 a.m. No other law enforcement personnel were present in the room. The office had one large window, and the office door was open during the interview. Defendant drank coffee and smoked cigarettes throughout their conversation. Emiren advised Defendant that the purpose of the interview was to obtain information. He did not advise Defendant of his Miranda rights. At that time, he was only a witness. Defendant gave an account of the previous day's events in narrative form. The account was specific as to times, persons encountered, and what activities Defendant had engaged in. Emiren testified that he noted the odor of beer on Defendant, but that he did not appear "fuzzy," evince an inability to remember things, or appear unable to comprehend what was happening at any time during their conversation. Emiren further testified that he never suggested that Defendant could not leave the jail, or terminate the interview, or quit talking at any time.

Emiren handwrote Defendant's statement and, when the interview was nearly completed, Emiren read the statement back to him. Defendant made some changes, initialed them, and signed the document. To summarize, Defendant claimed in his statement that he had no knowledge of, or anything to do with, Wilkey's death. Based upon his statement, it appeared to Emiren that Defendant could account for his actions during the time period that Wilkey was most likely killed.

Although Emiren conceded that the information he received from Defendant did not correspond with other information he had received, Emiren testified that he had no reason to arrest Defendant.

Emiren further testified that Defendant became briefly upset one time, when Emiren asked whether he would be willing to submit to a polygraph test. Defendant demanded the number of his attorney and threatened to sue the county. Emiren handed him a telephone directory. Shortly thereafter, Defendant "settled right back down, and wanted some coffee." Emiren had no knowledge that Defendant was illiterate. When the interview was completed, Defendant told Emiren that he was not feeling well. He requested that Emiren call his employer to inform him that he would not be reporting for work the next day. Emiren agreed. Angel and another officer then drove Defendant home.

At the suppression hearing, Defendant testified that he had no knowledge regarding the offense he was charged with and appeared largely unable to recall any significant details of the conversations that had occurred between him and his attorney concerning his trial. Defendant professed a general inability to assist with his defense or comprehend his situation. Among other things, Defendant claimed that he was unable to give his attorney names or information about potential witnesses, that he could not recall what constituted an alibi defense, that he was unaware that his jury trial had been scheduled for the next day, that he did not understand the concept of plea bargaining, and, generally, that he did not understand what he was doing in court that day. With regard to the circumstances surrounding his statement, Defendant testified that he recalled speaking with Emiren at the jail. However, he claimed that Emiren never read his statement to him and that he did not know what he was signing. (On November 24, 1999, the trial court ordered that Defendant undergo a forensic mental evaluation to determine his mental condition at the time of the offense and whether he was competent to stand trial. The record does not contain the results of the evaluation, but we may assume that Defendant was found mentally competent since the matter ultimately went to trial.)

The trial court denied Defendant's motion to suppress in an order filed October 5, 1999, which may be summarized as follows: The trial court expressed "concern" over the facts that (1) the interview took place during a late hour at the jail, which was some distance from Defendant's home, and (2) Defendant was transported to and from the jail in the back of a patrol car. However, the trial court determined that Defendant was an adult capable of voluntarily giving a statement and that the officers in charge had advised him that he was free to return home at any time. Based on the totality of the circumstances, the trial court concluded that Defendant's statement was voluntary and not the result of custodial interrogation. As such, his statement was admissible and not the result of a breach of Defendant's Fourth Amendment rights. The court also stated that Defendant "did not take the stand," but the record indicates that Defendant testified. This mistake is immaterial. The order reflects that the trial court's misstatement was made in the context of considering the credibility of the two officers and that the trial court determined that the officers' testimony that Defendant was free to go was "undisputed." Since the record reveals that Defendant's testimony offered no proof to contradict the officers' testimony that Defendant was free to go and/or terminate the interview,

-11-

the trial court's determination is unaffected and its mistaken finding that Defendant "did not take the stand" is of no consequence.

Returning to our review of the trial court's findings of fact and conclusions of law on the motion to suppress evidence, the standard of review is set forth in State v. Odom, 928 S.W.2d 18 (Tenn. 1996). Under this standard, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. at 23. As is customary, "the prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" State v. Carter, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998)). This Court reviews de novo the trial court's application of the law to the facts, without according any presumption of correctness to those conclusions. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001); State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999). We further note that in reviewing the correctness of a trial court's ruling on a pretrial motion to suppress, this Court may consider the proof adduced at both the suppression hearing and the trial. State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

**A. Whether Defendant Was "In Custody"**

Defendant argues that he was "in custody" when he gave his statement and, therefore, the trial court erred in ruling it admissible because he was not read his constitutional rights prior to Agent Emiren's questioning, as required by Miranda v. Arizona, 384 U.S. 436 (1966). The State argues that the interrogation of Defendant at the Bledsoe County Jail was non-custodial, and, thus, Miranda warnings were not warranted. We agree with the State.

In Miranda v. Arizona, the United States Supreme Court held that before custodial interrogation can take place, the police must inform the individual that (a) he has the right to remain silent; (b) any statement made may be used as evidence against him; (c) he has the right to the presence of an attorney; and, (d) if he cannot afford an attorney, one will be appointed for him prior to questioning, if he so desires. Miranda v. Arizona, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). "Custodial interrogation" was defined by the Miranda court as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id.

In Tennessee, the appropriate test for determining whether an individual is "in custody" for purposes of Miranda was set forth by our supreme court in State v. Anderson, 937 S.W.2d 851 (Tenn. 1996). Under Anderson, the proper inquiry is "whether, under the totality of the circumstances, a reasonable person in the suspect's position would consider himself or herself deprived of freedom of movement to a degree associated with a formal arrest." Id. at 855. The test is objective from the viewpoint of the suspect, and factors relevant to this determination include:

> (1) the time and location of the interrogation; (2) the duration and character of the questioning; (3) the officer's tone of voice and general demeanor; (4) the suspect's method of transportation to the place of questioning; (5) the number of police officers

present; (6) any limitation on movement or other form of restraint imposed on the suspect during the interrogation; (7) any interactions between the officer and the suspect, including the words spoken by the officer to the suspect, and the suspect's verbal or nonverbal responses; (8) the extent to which the suspect is confronted with the law enforcement officer's suspicions of guilt or evidence of guilt; and finally, (9) the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will.

Id. The Anderson court further concluded that the above factors were "by no means exclusive." Id. Instead, "the totality of the circumstances surrounding each interrogation must be closely examined when evaluating whether an individual is in custody for purposes of Miranda." Id. The inquiry is fact-specific, and "[a]pplication of the appropriate, relevant factors to the facts is a task for which the trial court is especially suited." Id.

With the above principles in mind, we turn to the facts of this case. Although 11:00 p.m. is an arguably inconvenient time for an interview, which then occurred at the jail, the totality of the circumstances regarding time and location do not support Defendant's argument. Defendant was interviewed in Officer Angel's office, not an austere setting. The office had a large window and the door was left open during the interrogation. While Defendant was not permitted to drink beer, he was allowed to smoke cigarettes, and the officers brought him coffee. The duration and character of the interview also appears generally non-custodial. The interview itself lasted barely an hour, before which both Emiren and Angel informed Defendant that the primary purpose of the conversation was to gather information. At least twice, Angel advised Defendant that he was not under arrest and, before the men even reached the jail, Angel offered to drive him back home if he desired. Defendant was driven to and from the interview in the rear of a patrol car, as it appears the other witnesses were. Regarding the presence of other officers, we note that Emiren was the sole officer present during the majority of the interrogation, and no limitation on Defendant's movement or other form of restraint was imposed at any time. Emiren further testified that although he and Defendant experienced one adverse incident, it appears to have been resolved fairly rapidly. Finally, we observe that Defendant was not confronted with suspicions or evidence of guilt during the interview, because none existed at that time.

In sum, we find that, given the totality of the circumstances, a reasonable person in Defendant's position would not consider himself deprived of freedom of movement to a degree associated with a formal arrest. Hence, he was not "in custody" as contemplated by Miranda v. Arizona, 384 U.S. 436 (1966).

**B. Voluntariness of Defendant's Statement**

Defendant further argues that, even if this Court determines that he was not "in custody" such that Miranda warnings were required, his statement was nevertheless not "voluntary" as contemplated by the federal and state constitutions. Defendant asserts that, at the time of his statement, he was inebriated and an illiterate individual who, having been awake for twenty-four

-13-

hours, was incapable of providing a "voluntary" statement. The State argues that Defendant's level of intoxication did not rise to a level which would cause his statements to be properly considered "involuntary." We agree with the State.

As a preliminary matter, we reject outright Defendant's contentions that because he was illiterate and/or weary during his conversation with Agent Emiren, he was rendered incapable of making a voluntary statement. There is no proof in the record to support either contention. Thus, the issue before this Court is whether the alleged level of alcohol intoxication in Defendant's blood caused the character of his statement to be involuntary. As previously concluded, Defendant was not "in custody" at the time of his pretrial statement to law enforcement officials. However, to be admissible in court, statements given in a non-custodial interrogation must still be voluntary. State v. Phillips, 30 S.W.3d 372, 376 (Tenn. Crim. App. 2000).

The test of voluntariness under the Tennessee Constitution is broader and more protective of individual rights than the test of voluntariness under the United States Constitution. State v. Stephenson, 878 S.W.2d 530, 544 (Tenn. 1994). For more than a century, courts have been struggling to articulate a test of voluntariness capable of accommodating the diverse circumstances under which accused individuals are questioned and, in many cases, ultimately confess. State v. Smith, 933 S.W.2d 450, 455 (Tenn. 1996). United States Supreme Court Justice Stewart noted that these efforts have yielded "no talismanic definition of 'voluntariness' . . . ." Schneckloth v. Bustamonte, 412 U.S. 218, 224, 93 S. Ct. 2041, 2046, 36 L. Ed. 2d 854 (1973).

In Tennessee, a court determines voluntariness based on its examination of the particular circumstances of each case as a whole. Smith, 933 S.W.2d at 455 (citing Monts v. State, 400 S.W.2d 722, 733 (1966)). In the context of confessions, "[t]he law in this state is well-established that '[t]he ingestion of drugs and alcohol does not in and of itself render any subsequent confession involuntary.'" State v. Morris, 24 S.W.3d 788, 805 (Tenn. 2000) (citations omitted). "It is only when an accused's faculties are so impaired that his or her confession cannot be considered the product of a free mind and rational intellect, that it should be suppressed." Id. (citations omitted). This standard similarly applies to statements by the accused which fall short of an actual confession. Regarding statements in general, if the accused is capable of giving a narrative of past events and relating his role in the commission of the crime, the statement is admissible, even though the accused was under the influence of alcohol when it was made. Id.; see State v. Bell, 690 S.W.2d 879, 882 (Tenn. Crim. App. 1985) ("intoxication or mental unsoundness is not alone sufficient to bar the introduction of statements made by an accused if the evidence also shows the accused was capable of understanding his rights" (citing State v. Green, 613 S.W.2d 229 (Tenn. Crim. App. 1980)); State v. Lowe, 584 S.W.2d 239, 241 (Tenn. Crim. App. 1979) (the blood alcohol content of the accused is merely a factor for the trial court to consider in determining whether a confession was the product of a free mind and a rational intellect).

In this case, the evidence suggests that defendant's confession was competently given. Granted, the two officers detected an odor of beer on Defendant's person prior to his giving the statement in issue. However, Defendant was clearly capable of giving Emiren a narrative of the

day's events, which was notably specific as to times, persons encountered, and the activities he had engaged in. Emiren testified that Defendant did not appear "fuzzy," or demonstrate difficulty recalling things, or appear unable to comprehend what was happening during their conversation.

In sum, we find that the evidence does not preponderate against the trial court's findings on this question, and its ruling will not be overturned by this Court. Defendant is not entitled to relief on this issue.

### III. Comments by the Trial Court

Defendant also contends that various comments made by the trial court during curative instructions to the jury constituted impermissible expressions of bias toward Defendant, which effectively deprived him of his right to a fair trial. We disagree.

Defendant's argument stems from two separate incidents which occurred during the trial, after which the trial judge gave the jury "curative" instructions. The first incident concerned defense counsel's attempts to impeach the witness, Mike Stafford, with questions about possible prior convictions, i.e., jury tampering, drug sales, public intoxication, and passing bad checks. In Tennessee, a witness' credibility may be attacked by proof that the witness has been convicted of a crime. See Tenn. R. Evid. 609. However, certain conditions must be satisfied before the evidence is admissible, and special procedures are required before a criminal conviction may be used to impeach a witness other than the accused. See Tenn. R. Evid. 609(a)-(d); Neil P. Cohen et al., Tennessee Law of Evidence § 6.09 (4th ed. 2000).

Here, the record reveals that Defendant's counsel did not fully comply with the rules governing this method of impeachment. Thus, the State objected, and the trial court sustained the objection. Afterward, the court gave the following instructions as to how the jury should consider what had occurred:

COURT:        Ladies and gentlemen, the [State's] objection is correct. The only thing that concerns the jury on questions of that nature is whether or not it would have any application, that is, a crime where there was a conviction would have any application to credibility, so whether somebody's charged with a crime, but not convicted, it's not proper for you to consider since there's no finding, and whether or not somebody might have been convicted of a DUI, for instance, that doesn't have anything to do with credibility unless the person maybe was arguing whether the person was sober or not at the particular time something happened.

The State is objecting, all this came in, so I've got to give you a full explanation. The only thing that's relevant about past acts, [are] past acts that relate to honesty and so forth, so a conviction, so a conviction of a felony offense is acceptable for the jury to know about. All other things that

-15-

somebody's accused of or that they might have done, that has nothing to do with their credibility, is not proper and some of the questions that were addressed by [Defendant's counsel] would ask for responses that just tend to make a witness look bad, but don't really address the issue of credibility, and for that reason I sustain the objection.

    . . . .

    Ladies and gentlemen, if there was some, I don't think I told you that every question he asked was improper. The response to the jury tampering is something you would consider. That is proper. And I believe he wants to ask another question on another possible crime, and if there's a conviction and if it's a matter involving honesty, or a felony conviction, that's proper, he's going to ask that question, but those other matters that were raised, issues of being charged or issues of driving under the influence are not relevant and that's what I was trying to express to you that you should not consider about those kinds of things.

    The second incident was similar in that it involved an attempt by Defendant's counsel to impeach another witness, Richard Wooden. In this instance, Defendant's counsel asked Wooden, "Are you a convicted felon?" Wooden answered affirmatively before the State could voice an objection. A jury-out hearing ensued, during which the court discovered that Wooden's felony conviction occurred in 1969 and, as such, it was inadmissible for impeachment purposes. See Tenn. R. Evid. 609(b) (generally prohibiting evidence of a conviction where more than ten years has elapsed between the date of release and commencement of the court proceeding). When the jury returned, the trial judge gave them the following instruction as to how it should consider Wooden's conviction:

COURT:    All right, ladies and gentlemen, before we sent you back in there the question was asked to the witness that was not properly phrased, and elicited an answer that you heard, so the only thing I can do to correct what happened is to try to tell you a little bit why you are not to consider on your judgment of this witness the fact that he said that he was convicted of a felony. Our rules of evidence say that all evidence that is used, even on issues of credibility, has to be relevant to that issue. And one of the issues of relevance is closeness in time to something that may have happened. Our . . . rules of evidence specifically say that past convictions can be brought out when a witness has testified, so a jury can judge their credibility, but they should not be older than 10 years before the time of the issue that you're being asked to judge credibility on.

-16-

Now, as it turns out, this man has been apparently convicted of a felony back in 1969, so that's many many years removed from this incident, and it would be improper for you to consider the fact that he answered this question, which was too broad, should not have been asked. It was determined that counsel did not, in fact, know of this situation, or he would be in real hot water as far as the Court is concerned, because no attorney can intentionally bring forth evidence that clearly is improper for a jury to consider, but [Defendant's counsel] was not aware of this conviction. As an officer of the court, I accept his statement on that issue. His question should have been phrased differently. Unfortunately, before the objection could be acted upon, the witness answered the question, so there you've got this impression before the Court that this man was convicted of a felony. I'm telling you that a felony that long past is not relevant information upon which you should judge his credibility. It's too long in the past. Our rules would not have allowed that question to have been answered if we'd been able to deal with it quickly enough, but sometimes we're unable to do that, so you're instructed that you cannot use that answer that he gave to weigh his credibility and I think that's really about all I can say.

Defendant contends that the trial court also made comments and gave opinions during these incidents which "directly commented on the credibility" of the two witnesses. Defendant argues that this, in conjunction with the fact that the court's instructions were "not accurate statements of the law," constitutes reversible error and justifies a new trial.

The briefs of both the State and Defendant cite our supreme court's decisions in State v. Cazes, 875 S.W.2d 253 (Tenn. 1994), and State v. Suttles, 767 S.W.2d 403 (Tenn. 1989), in their arguments on this issue. In State v. Cazes, the court stated that "a trial judge has broad discretion in controlling the course and conduct of the trial, and that in exercising that discretion, he or she must be careful not to express any thought that might lead the jury to infer that the judge is in favor of or against the defendant . . . ." Cazes, 875 S.W.2d at 260 (citing State v. Caughron, 855 S.W.2d 526, 536 (Tenn. 1993)). A similar caveat was expressed in State v. Suttles, when the court stated that "[i]n all cases the trial judge must be very careful not to give the jury any impression as to his feelings or to make any statement which might reflect upon the weight or credibility of evidence or which might sway the jury." Suttles, 767 S.W.2d 403, 406-407 (Tenn. 1989).

We agree that the comportment of a trial judge is unquestionably important in the conduct of a fair trial and that his impartiality is a key component in the administration of justice. However, Defendant's brief on this issue fails to cite any *specific* comments by the trial court which it regarded as improper, and, a thorough review of the record concerning the above incidents reveals nothing that would indicate partiality or bias toward Defendant or any witness on the part of the trial judge. Because we also find that the instruction given the jury was not an inaccurate statement of the law, we conclude that the trial court did not err. Defendant is not entitled to relief on this issue.

-17-

## IV. Admissibility of Evidence

Defendant argues that the trial court erred (1) when it excluded evidence that a person other than Defendant had assaulted the victim on the day of his death, and (2) when it allowed an expert to testify concerning evidence which was not revealed to Defendant during regular discovery. These two issues are predicated on alleged errors committed during Defendant's trial and were not included in his motion for a new trial. Thus, they may be treated as waived. Tenn. R. App. P. 3(e); see also Tenn. R. App. P. 36(a).

Even if not waived, these issues would not entitle Defendant to relief. Defendant asserts that he should have been permitted to "point the finger of guilt" at someone other than himself by presenting evidence that a person other than Defendant had a motive to kill the victim. Specifically, he wanted the trial court to allow the victim's son, Dallas Wilkey, to testify that a man named Charles Cole had attacked his father, the victim, in the hours preceding his death. Defendant had been informed that Cole and Dallas Wilkey broke into a fight in the courthouse courtyard over this fact. He was also told that a woman named Melissa Nipper witnessed the skirmish and heard Dallas Wilkey exclaim that he struck Cole "for striking his daddy the day he died." The problem with allowing Dallas Wilkey's testimony arose during Defendant's offer of proof in a jury-out hearing. At that time, Dallas Wilkey denied striking Cole for the reason suggested by Defendant. Instead, he claimed that he struck Cole merely because he disliked him. Consequently, Defendant requested permission to present testimony from Nipper reiterating what Dallas Wilkey had shouted in the courtyard. The trial judge ultimately ruled that Dallas Wilkey's testimony, as heard during Defendant's proffer of evidence, was not relevant and that Nipper's testimony was inadmissible hearsay. Based on the record before us, we concur with the trial court's ruling. See Tenn. R. Evid. 802. Defendant is not entitled to relief on this issue.

Defendant's second argument contends that the trial court erred by allowing the State's expert to testify concerning test results relating to the bullet discovered in the victim's left buttock. Apparently, the State had neglected to include this bullet when it submitted the three bullets recovered from the wall of the victim's bedroom for analysis by the TBI Crime Lab. The oversight was discovered on the day prior to trial. When Defendant learned that the State's expert witness would testify that the bullet recovered from the victim's body was consistent with the three bullets found lodged in the wall, he objected. Defendant argued that the evidence should be excluded because of untimely discovery or, in the alternative, the court should grant Defendant a continuance to conduct an independent analysis to confirm that the bullets were "consistent," as claimed by the State. The trial court denied Defendant's motion, based on the fact that Defendant was previously aware that (1) a total of four bullets had been recovered and (2) the possibility existed that the fourth may be found "consistent" with the other three. The trial court also observed that Defendant had chosen not to seek independent testing of the other three bullets.

Discovery and inspection of the evidence by both the State and the accused in a criminal case is generally governed by Rule 16 of Tennessee's Rules of Criminal Procedure. Upon his or her request, a defendant is entitled to inspect or copy or photograph the results and/or reports of

scientific tests or experiments within the possession, custody, or control of the state, the existence of which is known or may become known by the exercise of due diligence. See Tenn. R. Crim. P. 16(a)(1)(D). The duty to disclose is a continuing obligation, which includes additional evidence discovered up to and during the trial. See Tenn. R. Crim. P. 16(c). Failure to comply with the rule may result in the court ordering an exclusion of the offending party's evidence. In lieu of exclusion, the court may grant a continuance or "enter such other order as it deems just under the circumstances." Tenn. R. Crim. P. 16(d)(2). Whether a defendant has been prejudiced by a failure to disclose information is a significant factor in fashioning an appropriate remedy. State v. Smith, 926 S.W.2d 267, 270 (Tenn. Crim. App. 1995). Exclusion of the evidence is considered a "drastic" measure, not recommended unless no reasonable alternative exists. Id.

In the case sub judice, Defendant has failed to show that he was prejudiced by either the expert's testimony or the lack of independent testing. We find it significant that Defendant chose not to have the other three bullets evaluated, for we fail to decipher a significant distinction between these three bullets and the one in issue, with one exception: according to the medical examiner, the fourth bullet caused the *only* wound determined *not* to be lethal, i.e., capable of causing death within five minutes. The admissibility of evidence is a matter within the sound discretion of the trial court, and this Court will not disturb the trial court's ruling absent a clear showing of an abuse of that discretion. See State v. Cauthern, 967 S.W.2d 726, 743 (Tenn. 1998); State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). Because we find no abuse of discretion, Defendant is not entitled to relief on this issue.

## V. Lesser-Included Offenses

Defendant was charged with first degree murder. The trial court instructed the jury on first degree murder, second degree murder, and voluntary manslaughter. The jury convicted Defendant of second degree murder. Defendant contends that the trial court erred by refusing his request to also charge the jury on the lesser-included offenses of reckless homicide and criminally negligent homicide. We disagree.

The State concedes that reckless homicide and criminally negligent homicide are lesser-included offenses of first degree murder. See State v. Sims, 45 S.W.3d 1, 21 (Tenn. 2001). However, the State argues that under State v. Burns, 6 S.W.3d 453 (Tenn. 1999), the trial court is under a mandatory duty to only instruct the jury on lesser-included offenses where evidence exists that reasonable minds could accept as to the lesser-included offense, and the evidence is legally sufficient to support such a conviction. Id. at 469. The State submits that since there was no evidence which reasonable minds could accept as to reckless homicide or criminally negligent homicide, it was not error to refuse to charge the jury on these offenses.

Under the circumstances presented here, the evidence was sufficient to prove beyond a reasonable doubt that Defendant committed second degree murder, a knowing killing. See Tenn. Code Ann. § 39-13-210(a)(1). The record reflects that the trial court instructed the jury on the lesser-included offense of voluntary manslaughter. If it was error to refuse to instruct the jury on additional

-19-

lesser-included offenses as requested by Defendant, the proper inquiry for this Court would be whether that error would be harmless beyond a reasonable doubt. See State v. Ely, 48 S.W.3d 710, 727-28 (Tenn. 2001) (a defendant's right to instruction on all offenses embraced by the indictment is not derived only from statute, but from the Tennessee Constitution as well). Our review reveals that, under State v. Williams, 977 S.W.2d 101 (Tenn. 1998), the trial court's failure to instruct on reckless homicide or criminally negligent homicide, if error, would be harmless beyond a reasonable doubt.

In Williams, the defendant was on trial for first degree murder. The trial judge instructed the jury on the elements necessary to prove first degree premeditated murder, and the lesser-included offenses of second degree murder and reckless homicide. The jury ultimately convicted the defendant of first degree murder. The defendant argued that because the proof introduced at trial was legally sufficient to warrant an instruction upon voluntary manslaughter, the trial court erred in refusing to charge that offense to the jury. The supreme court agreed that the jury should have been instructed on voluntary manslaughter, but further concluded that the trial court's failure to instruct was harmless error. See id. at 106. Specifically, the court in Williams determined that

> [B]y finding the defendant guilty of the highest offense to the exclusion of the immediately lesser offense . . . the jury necessarily rejected all other lesser offenses . . . . Accordingly, the trial court's erroneous failure to charge voluntary manslaughter is harmless beyond a reasonable doubt because the jury's verdict of guilt on the greater offense of first degree murder and its disinclination to consider the lesser included offense of second degree murder clearly demonstrates that it certainly would not have returned a verdict on voluntary manslaughter.

Id. at 107 (citations omitted).

In a similar vein, by finding Defendant guilty of second degree murder, we may conclude that the jury necessarily rejected the other charged lesser offense, and, further, that its disinclination to consider the lesser-included offense of voluntary manslaughter clearly demonstrates that it certainly would not have returned a verdict of guilt for reckless homicide or criminally negligent homicide. Defendant is not entitled to relief on this issue.

## VI. Sentencing

Finally, Defendant contends that the twenty-three year sentence imposed by the trial court was improperly enhanced based on criminal behavior exhibited by Defendant *after* the indictment. We disagree.

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. §§ 40-35-401(d), 402(d) (1997). If the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles

-20-

relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred.  State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances."  State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).   Therefore, meaningful appellate review requires that the trial court place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor applied, and articulate how the mitigating and enhancement factors were evaluated and balanced in determining the sentence.  State v. Poole, 945 S.W.2d 93, 96 (Tenn. 1997); see Tenn. Code Ann. § 40-35-210(f) (1997).  The burden is on the appealing party to show that the sentencing is improper.  Tenn. Code Ann. § 40-35-401 (1997), Sentencing Commission Comments.

In conducting a de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf, and (7) the potential for rehabilitation or treatment.  Id. §§ 40-35-102, 103, 210; see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229 (Tenn. 1986).

Defendant was convicted of a Class A felony.  The presumptive sentence for a Class A felony is the midpoint in the range when no enhancement or mitigating factors are present.  See Tenn. Code Ann. § 40-35-210(c) (1997).  Procedurally, the trial court is to increase the sentence within the range based upon the existence of enhancement factors and then reduce the sentence as appropriate for any mitigating factors.  Id. § 40-35-210(d), (e).  The weight to be afforded an existing factor is left to the trial court's discretion so long as it complies with the purposes and principles of the Sentencing Act, and its findings are adequately supported by the record.  Id. § 40-35-210, Sentencing Commission Comments; Moss, 727 S.W.2d at 237; see Ashby, 823 S.W.2d at 169.

Defendant was sentenced as a standard Range I offender.  See Tenn. Code Ann. § 40-35-105 (1997).  According to the record, the trial court found that two enhancement factors applied in Defendant's case: (1) "[t]he defendant has a previous history of criminal convictions or *criminal behavior* in addition to those necessary to establish the appropriate range," and (9) "[t]he defendant possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense."  Id. § 40-35-114(1), (9) (emphasis added).  The trial court also applied mitigating factor (8), "[t]he defendant was suffering from a mental or physical condition that significantly reduced the defendant's culpability for the offense; and factor (13), "[a]ny other factor consistent with the purposes of this chapter," based on a finding that Defendant had lived a responsible life as a citizen "for the first 50 or so years of his life."  Id. § 40-35-113(8), (13).

The trial court assigned significant weight to both mitigating factor (13) and enhancement factor (9), which it concluded effectively "offset" each other.  The trial court assigned "some" weight

to mitigating factor (8), and then enhanced Defendant's sentence three years based on the great significance it gave Defendant's previous history of criminal behavior, under enhancement factor (1). Although Defendant's prior criminal record reveals only two misdemeanor convictions for driving without a license, the trial court gave this factor considerable weight based on proof of additional *criminal behavior*, to wit: Defendant's attempt to shoot a witness in his case. The presentence report shows that in May 1999, Defendant was arrested for attempting to kill Mike Stafford with a handgun. Defendant was on bond for the instant offense at the time he allegedly shot Stafford, a State witness in his upcoming trial. Bond was revoked on June 16, 1999, and in July 1999, Defendant was indicted for attempt to commit first degree murder. At the conclusion of the hearing, the trial court announced that, if enhancement factor (1) should subsequently be determined inapplicable, the length of Defendant's sentence should be reduced to twenty years, the presumptive sentence in the range.

Defendant does not dispute the trial court's use of enhancement factor (9), and we find this factor was properly applied. We also find no error in the trial court's use of mitigating factors in this case. Thus, the sole sentencing issue before this Court is whether enhancement factor (1) was applicable, based on proof of criminal behavior which occurred subsequent to the offense for which Defendant was convicted and sentenced. Defendant asserts that pending charges may not be used as "criminal behavior" for purposes of enhancing punishment under Tennessee Code Annotated section 40-35-114(1). The State responds that a panel of this Court has previously decided that a sentencing court may consider proof of criminal behavior occurring prior to the sentencing hearing when determining whether to apply factor (1), regardless of whether the criminal behavior occurred before or after the commission of the instant offense. See State v. Chris Smith, No. 03C01-9807-CR-00259, 1999 Tenn. Crim. App. Lexis 838, McMinn County (Tenn. Crim. App., Knoxville, Aug. 17, 1999), perm. to app. denied (Tenn. 2000). The State concedes that a trial court is precluded from considering merely a defendant's prior arrests or pending charges, but argues that no per se rule in Tennessee prohibits a court from considering unadjudicated conduct. Rather, "the trial court is merely prohibited from relying upon a mere arrest record to enhance a defendant's sentence." State v. Robinson, 971 S.W.2d 30, 46 (Tenn. Crim. App. 1997).

Defendant cites State v. Buckmeir, 902 S.W.2d 418 (Tenn. Crim. App. 1995), to support his argument that the trial court is precluded from considering pending criminal charges to enhance his sentence. In Buckmeir, a panel of this Court determined that the trial judge improperly considered pending charges in sentencing the defendant. See id. at 424. Specifically, this Court noted that the record contained "no evidence" that the charges against the defendant "were anything more than charges." Because the defendant should be presumed innocent until convicted of those charges, our Court concluded that the trial judge should not have considered them. Id. The Buckmier opinion revealed no further details on the charges pending in that case. However, this Court cited State v. Miller, 674 S.W.2d 279, 284 (Tenn. 1984), wherein the supreme court stated: "Ordinarily mere arrests or indictments are not evidence of the commission of a prior crime. They are nothing more than charges or accusations made by the arresting or indicting authority upon such information as that authority had at the time." Id. In the case sub judice, the evidence that Defendant attempted to kill Stafford amounts to much more than "mere charges." The trial court stated that it "heard the

-22-

victim in that case testify under oath, subject to cross-examination, that, in fact, [Defendant] did shoot him." (The trial judge apparently heard this testimony from the victim, Mike Stafford, during the hearing on the State's motion to revoke Defendant's bond, which was granted on June 16, 1999.)

In State v. Carico, 968 S.W.2d 280 (Tenn. 1998), our supreme court considered the issue whether evidence of prior criminal acts committed by the appellant for which there had been no criminal conviction, constituted "criminal behavior" for purposes of enhancing the appellant's sentence. See id. at 287-88. The supreme court began by noting that "the United States Supreme Court has held that the Sixth and Fourteenth Amendments to the United States Constitution do not prohibit a sentencing court from considering a defendant's previous criminal behavior which does not result in conviction." Id. at 287. It cited Williams v. New York, 337 U.S. 241, 69 S. Ct. 1079, 93 L. Ed. 1337 (1949), as the origin of the holding, and quoted Justice Black, who delivered the opinion of the Court:

> A sentencing judge . . . is not confined to the narrow issue of guilt. His task within fixed statutory or constitutional limits is to determine the type and extent of punishment after the issue of guilt has been determined. Highly relevant--if not essential--to his selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics.

Id. at 247, 69 S. Ct. at 1083. Our supreme court also recognized, along with prior federal and state decisions, that the trial court may utilize criminal behavior shown by a preponderance of the evidence to enhance a sentence without violating federal or state due process. Carico, 968 S.W.2d at 287; see also State v. Winfield, 23 S.W.3d 279, 282-83 (Tenn. 2000). The court ultimately concluded that, although the phrase "criminal behavior" had not been previously defined for purposes of applying enhancement factor (1), the appellant's prior sexual acts with a ten-year-old child clearly and firmly established "criminal behavior" for purposes of applying enhancement factor (1). Carico, 968 S.W.2d at 288.

Relying on the various court decisions discussed above, we find Defendant's attempt to shoot the witness, Mike Stafford, constitutes "criminal behavior" for purposes of applying enhancement factor (1). Further, we concur with those cases which have concluded that a sentencing court is not per se prohibited from considering unadjudicated criminal conduct where such conduct is established by a preponderance of the evidence, as it was here. See State v. Robinson, 971 S.W.2d 30, 46 (Tenn. Crim. App. 1997) (a sentencing court is "merely prohibited from relying upon a mere arrest record to enhance a defendant's sentence"); State v. Hunter, 926 S.W.2d 744, 748-49 (Tenn. Crim. App. 1995) (victim's testimony concerning acts of sexual abuse not included in defendant's indictment were not improper to consider in enhancing sentence); State v. Chris Smith, No. 03C01-9807-CR-00259, 1999 Tenn. Crim. App. Lexis 838 at *8, McMinn County (Tenn. Crim. App., Knoxville, Aug. 17, 1999), perm to app. denied (Tenn. 2000) (criminal behavior occurring prior to the sentencing hearing may be considered as evidence of prior criminal behavior for purposes of enhancement under factor (1), regardless of whether the offending conduct occurred before or after

commission of the offense under consideration).  Accordingly, Defendant is not entitled to relief on this issue.

## CONCLUSION

For the above reasons, the judgment of the trial court is AFFIRMED.

_____
THOMAS T. WOODALL, JUDGE